Nos. 2015-1628 & -1629

# United States Court of Appeals
# for the Federal Circuit

DYNAMIC 3D GEOSOLUTIONS LLC,

*Plaintiff-Appellant*,

ACACIA RESEARCH CORPORATION,
ACACIA RESEARCH GROUP LLC,

*Nonparties-Appellants*,

v.

SCHLUMBERGER LIMITED (SCHLUMBERGER N.V.),
SCHLUMBERGER HOLDINGS CORPORATION,
SCHLUMBERGER TECHNOLOGY CORPORATION,

*Defendants-Appellees*.

Appeals from the United States District Court for the Western District of Texas
in No. 1:14-cv-00112-LY, Judge Lee Yeakel.

## BRIEF OF APPELLEES

Terrence J. Connolly
LATHAM & WATKINS LLP
885 Third Avenue
New York, NY 10022
(212) 906-1200

Ann Marie Wahls
LATHAM & WATKINS LLP
330 North Wabash Ave., Suite 2800
Chicago, IL 60611
(312) 876-7700

November 2, 2015

Maximilian A. Grant
Gabriel K. Bell
Thomas J. Humphrey
LATHAM & WATKINS LLP
555 Eleventh St., NW, Suite 1000
Washington, DC 20004
(202) 637-2200

*Counsel for Appellees*

## CERTIFICATE OF INTEREST

Counsel for Appellees certifies the following:

1. The full name of every party or amicus curiae represented by me is:

    Schlumberger Limited (Schlumberger N.V.), Schlumberger Holdings Corporation, and Schlumberger Technology Corporation.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

    N/A.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

    Schlumberger Technology Corporation is wholly-owned by Schlumberger Holdings Corporation.

    Schlumberger Holdings Corporation is an indirectly, wholly-owned subsidiary of Schlumberger Limited (Schlumberger N.V.), a publicly traded company.

4. The names of all law firms and the partners or associates that appeared for the party or amicus curiae now represented by me in the trial court or agency or are expected to appear in this court are:

    **Latham & Watkins LLP:** Maximilian A. Grant, Terrence J. Connolly, Ann Marie Wahls, Gabriel K. Bell, Elizabeth M. Roesel (no longer with firm), Eugene Chiu, and Thomas J. Humphrey.

    **Scott, Douglass & McConnico, LLP:** Paige Arnette Amstutz, Stephen E. McConnico, and Steven J. Wingard.

November 2, 2015                    _/s/_ Maximilian A. Grant
                                    Maximilian A. Grant

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ............................................................................i

TABLE OF AUTHORITIES ...............................................................................v

STATEMENT OF RELATED CASES ................................................................1

COUNTERSTATEMENT OF THE ISSUES........................................................1

INTRODUCTION ..............................................................................................2

COUNTERSTATEMENT OF THE CASE...........................................................4

    A.    Factual Background.................................................................4

        1.    The Parties.......................................................................4

        2.    Rutherford Served As Schlumberger's Deputy General Counsel For Intellectual Property ..................................5

        3.    Rutherford Counseled Acacia To Acquire The '319 Patent And Sue Her Former Client Schlumberger On It ...........8

    B.    District Court Proceedings ......................................................12

        1.    D3D Sues Schlumberger Alleging Knowledge Of The Patent And Willful Infringement ...............................12

        2.    Schlumberger Moves To Disqualify Rutherford And Others .........................................................................13

SUMMARY OF THE ARGUMENT ....................................................................16

ARGUMENT ....................................................................................................19

I.    STANDARD OF REVIEW ........................................................................19

II.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DISQUALIFYING COUNSEL..................................................................20

    A.    The District Court Did Not Abuse Its Discretion In Disqualifying Rutherford ......................................................20

**Page**

    1.    Far From Being Clearly Erroneous, The District Court's Finding Of A Substantial Relationship Was Compelled By The Factual Record Before The Court ................................21

    2.    Appellants Improperly Ask This Court To Reweigh The Evidence And Make Contrary Findings As A Trier Of Fact ........................................................................27

B.    The District Court Did Not Abuse Its Discretion In Disqualifying Acacia's Other In-House Counsel .......................................................32

    1.    Under Fifth Circuit Law There Is An Irrebuttable Presumption That Rutherford Shared Confidences With The Other Acacia In-House Counsel ........................................32

    2.    Even If The Presumption Were In Fact Rebuttable, The District Court Properly Found D3D Failed To Rebut The Presumption That Rutherford Shared Confidences With Other Acacia In-House Counsel ................................37

    3.    Even If There Were *No* Presumption, The District Court Properly Found Rutherford Shared Confidences With Other Acacia In-House Counsel ................................42

    4.    Equitable Factors Strongly Favor Disqualification .................45

    5.    Appellants Again Improperly Ask This Court To Make Factual Findings And Substitute Its Judgment For That Of The District Court ................................................49

C.    The District Court Did Not Abuse Its Discretion In Disqualifying Outside Counsel .......................................................54

    1.    The District Court Properly Found That Appellants Failed To Rebut The Presumption That Rutherford Or Other In-House Counsel Shared Confidences With Outside Counsel ....................................................55

    2.    Even If There Were In Fact *No* Presumption, The District Court Properly Found That Rutherford Shared Confidences With Outside Counsel .........................57

**Page**

III.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DISMISSING WITHOUT PREJUDICE ........................................................59

IV.   ACACIA'S BELATED DUE PROCESS ARGUMENT IS MERITLESS.........................................................................................61

    A.   Acacia Had Notice.............................................................................62

    B.   Acacia Had An Opportunity To Be Heard In Person And In Fact Did Respond In Writing ....................................................................63

CONCLUSION .............................................................................................65

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ackerman v. National Property Analysts, Inc.*,
  887 F. Supp. 510 (S.D.N.Y. 1993), *aff'd*, 60 F.3d 810 (2d Cir.
  1995) ..................................................................................................61

*ACS Hospital Systems, Inc. v. Montefiore Hospital*,
  732 F.2d 1572 (Fed. Cir. 1984) ...................................................50, 51

*In re American Airlines, Inc.*,
  972 F.2d 605 (5th Cir. 1992) ...................................................*passim*

*American Can Co. v. Citrus Feed Co.*,
  436 F.2d 1125 (5th Cir. 1971) .........................................................33

*In re American Home Products Corp.*,
  985 S.W.2d 68 (Tex. 1998)........................................41, 42, 55, 56, 57

*Anderson v. City of Bessemer City*,
  470 U.S. 564 (1985)...........................................................19, 53, 54

*In re Apeldyn Corp.*,
  391 F. App'x 873 (Fed. Cir. 2010) ...............................................27, 40

*Baldwin Hardware Corp. v. Franksu Enteprise Corp.*,
  78 F.3d 550 (Fed. Cir. 1996) ......................................................61, 62

*Breland v. United States*,
  323 F.2d 492 (5th Cir. 1963) .........................................................52

*Brennan's, Inc. v. Brennan's Restaurants, Inc.*,
  590 F.2d 168 (5th Cir. 1979) .........................................................56

*Carlisle v. M/S Sistina*,
  407 F.2d 824 (5th Cir. 1969) .........................................................52

*Carreno v. City of Newark*,
  834 F. Supp. 2d 217 (D.N.J. 2011).................................................30

**Page(s)**

*In re CMH Homes, Inc.*,
   No. 04-13-00050-CV, 2013 WL 2446724 (Tex. Ct. App. June 5,
   2014) ................................................................................................56

*Colonial Penn Insurance v. Market Planners Insurance Agency Inc.*,
   157 F.3d 1032 (5th Cir. 1998) ....................................................20, 50

*In re Columbia Valley Healthcare System, L.P.*,
   320 S.W.3d 819 (Tex. 2010) ....................................21, 34, 36, 37, 38

*In re DataTreasury Corp.*,
   No. 2010-M928, 2010 WL 3074395 (Fed. Cir. Aug. 5, 2010) ...................46, 47

*Dieter v. Regents of the Universiy of California*,
   963 F. Supp. 908 (E.D. Cal. 1997) ....................................................31

*Doe v. A Corp.*,
   709 F.2d 1043 (5th Cir. 1983) ...........................................................60

*EZ Paintr Corp. v. Padco, Inc.*,
   746 F.2d 1459 (Fed. Cir. 1984) .........................................................40

*Grant v. Thirteenth Court of Appeals*,
   888 S.W.2d 466 (Tex. 1994) ......................................................41, 42

*In re Guaranty Insurance Services, Inc.*,
   343 S.W.3d 130 (Tex. 2011) .............................................34, 36, 37

*Harding v. United States Naval Academy*,
   567 F. App'x 920 (Fed. Cir. 2014) ....................................................64

*Henderson v. Floyd*,
   891 S.W.2d 252 (Tex. 1995) ......................................................34, 36

*In re Hyundai Motor America*,
   185 F. App'x 940 (Fed. Cir. 2006) ....................................................19

**Page(s)**

*Kennedy v. MindPrint (In re ProEducation International, Inc.),*
   587 F.3d 296 (5th Cir. 2009) ....................................................................*passim*

*King v. Governor of t New Jersey,*
   767 F.3d 216 (3d Cir. 2014) ................................................................44, 45, 58

*Kraft, Inc. v. Alton Box Board Co. (In re Corrugated Container
   Antitrust Litigation),*
   659 F.2d 1341 (5th Cir. 1981) ....................................................................28, 33

*LaSalle National Bank v. County of Lake,*
   703 F.2d 252 (7th Cir. 1983) ...........................................................................40

*Ledwig v. Cuprum S.A.,*
   No. SA-03-CA-542-RF, 2004 WL 573650 (W.D. Tex. Jan. 28,
   2004) ...............................................................................................................57

*National Medical Enterprises, Inc. v. Godbey,*
   924 S.W.2d 123 (Tex. 1996) .............................................................................34

*National Oilwell Varco, L.P. v. Omron Oilfield & Marine, Inc.,*
   60 F. Supp. 3d 751 (W.D. Tex. 2014) .........................................................47, 53

*Nielsen v. United States,*
   976 F.2d 951 (Fed. Cir. 1992) ..........................................................................19

*O2 Micro International Ltd. v. Beyond Innovation Technology Co.,*
   449 F. App'x 923 (Fed. Cir. 2011) ...................................................................31

*Omnicare, Inc. v. Laborers District Council Construction Industry
   Pension Fund,*
   135 S. Ct. 1318 (2015)...........................................................................44, 45, 58

*OneBeacon Insurance Co. v. T. Wade Welch & Associates,*
   No. H-11-3061, 2012 WL 393309 (S.D. Tex. Feb. 6, 2012) ...........................36

*Pacific Harbor Capital v. Carnival Air Lines, Inc.,*
   210 F.3d 1112 (9th Cir. 2000) .....................................................................61, 63

*Powell v. Home Depot U.S.A., Inc.,*
   663 F.3d 1221 (Fed. Cir. 2011) ........................................................................26

**Page(s)**

*Rex-Tech International LLC v. Rollings (In re Rollings)*,
451 F. App'x 340 (5th Cir. 2011) ....................................................20

*In re Riles*,
243 F.3d 555, No. 620, 2000 WL 1062086 (Fed. Cir. July 20,
2000) .................................................................................................27

*Schlesinger v. Herzog*,
2 F.3d 135 (5th Cir. 1993) ...........................................29, 31, 50, 53

*SEC v. Rocklage*,
470 F.3d 1 (1st Cir. 2006).....................................................44, 45, 58

*St. Mary's Honor Center v. Hicks*,
509 U.S. 502 (1993)........................................................................52

*Stone v. FDIC*,
179 F.3d 1368 (Fed. Cir. 1999) ......................................................61

*United States ex rel. Fair Laboratory Practices Associates v. Quest
Diagnostics Inc.*,
No. 05-Civ. 5393(RPP), 2011 WL 1330542 (S.D.N.Y. Apr. 5,
2011), *aff'd sub nom. United States v. Quest Diagnostics Inc.*, 734
F.3d 154 (2d Cir. 2013) ...................................................................61

*United States ex rel. Holmes v. Northrop Gruman Corp.*,
No. 1:13cv85-HSO-RHW, 2015 WL 3504525 (W.D. La. June 3,
2015) .................................................................................................61

*Vinewood Capital, LLC v. Sheppard Mullin Richter & Hampton, LLP*,
735 F. Supp. 2d 503 (N.D. Tex. 2010) .............................................57

*Wai Hoe Liew v. Cohen & Slamowitz, LLP*,
No. 14-cv-4868, 2015 WL 5579876 (E.D.N.Y. Sept. 22, 2015).......30

*Wanlass v. General Electric Co.*,
148 F.3d 1334 (Fed. Cir. 1998) ......................................................52

*Williamson v. Brown*,
646 F.2d 196 (5th Cir. May 1981)..............................................19, 31

**Page(s)**

*Wilson P. Abraham Construction Corp. v. Armco Steel Corp.*,
   559 F.2d 250 (5th Cir. 1977) ............................................................................57

**STATUTES**

28 U.S.C. § 1746 ............................................................................................28

35 U.S.C. § 101 ..............................................................................................13

**OTHER AUTHORITIES**

ABA Committee on Ethics & Professional Responsibility,
   Formal Op. 99-415 (1999) ...........................................................................30

Amon Burton, *Migratory Lawyers & Imputed Conflicts of Interest*,
   16 Rev. Litig. 665 (1997).......................................................................35, 36

Fed. R. Civ. P. 52(a)................................................................................19, 50

Model Rules Professional Conduct..................................................................44

Restatement (Third) of Law Governing Lawyers (2000) ...................................33, 44

Texas Disciplinary R. Professional Conduct ....................................................33

Texas Professional Ethics Committee, Formal Op. 598........................................36

W.D. Tex. Ct. R. AT-7(a) .............................................................................20

## STATEMENT OF RELATED CASES

No appeal in this matter was previously before this or any other appellate court.    Counsel for Appellees Schlumberger Limited (Schlumberger N.V.), Schlumberger Holdings Corporation, and Schlumberger Technology Corporation (collectively, "Schlumberger") are not aware of any other pending case that will directly affect or be directly affected by this Court's decision in this appeal.

## COUNTERSTATEMENT OF THE ISSUES

1.  Whether the district court abused its discretion in disqualifying Charlotte Rutherford, where Rutherford, upon leaving her position as Deputy General Counsel for Intellectual Property at Schlumberger (the defendant in this case), immediately began working as in-house counsel for Acacia (the parent of the plaintiff in this case) and participated in and approved Acacia's decision to acquire U.S. Patent No. 7,986,319 ("'319 patent"), the only patent-in-suit, and sue her former client, Schlumberger, for willful infringement of that patent.

2.  Whether the district court abused its discretion in disqualifying Acacia's other in-house counsel—including, among others, Gary Fischman, who managed the present action against Schlumberger, reported directly to Rutherford, and communicated with Rutherford about the action against Schlumberger.

3.   Whether the district court abused its discretion in disqualifying Acacia's outside counsel, Michael Collins and the Collins Edmonds firm, who (along with Rutherford and Fischman) actively advised on, planned, and conducted the present lawsuit against Schlumberger, as well as five other defendants in five additional lawsuits that asserted infringement of the '319 patent.

4.   Whether the district court abused its discretion in dismissing the lawsuit without prejudice because the lawyers who drafted the pleadings and brought the lawsuit against Schlumberger must be disqualified from the case.

5.   Whether Acacia was denied due process even though it was fully aware of the disqualification motion and had ample opportunity to be heard in person and did, in fact, respond in writing.

## INTRODUCTION

Charlotte Rutherford was a senior intellectual property attorney who worked at, and represented, Schlumberger for six years, including three years as Director of Intellectual Property and Deputy General Counsel for Intellectual Property.  In May 2013, she left Schlumberger to work for Acacia Research Group LLC, a patent licensing and assertion company, as its Senior Vice President and Associate General Counsel.  Immediately, she began actively participating in her new client's efforts to acquire the '319 patent from a third party and to sue her former client, Schlumberger, on that patent.  In her own words, she "concurr[ed] with the

2

recommendation from [Acacia's] outside counsel and [Acacia's other] in-house counsel to acquire the 319 Patent and to sue Schlumberger." A826 (31:11-18). In late January 2014, Rutherford provided approving feedback on outside counsel's draft complaint against Schlumberger, which alleged, among other things, that Schlumberger willfully infringed the '319 patent during Rutherford's tenure as senior intellectual property counsel to Schlumberger.

Faced with this textbook ethical impropriety, the district court had no choice but to disqualify Rutherford from participating in this case against her former client and to disqualify Rutherford's in-house counsel colleagues at Acacia. The district court also properly found that the substantial contacts and coordination between Rutherford, Acacia's other in-house counsel, and Acacia's outside counsel warranted disqualifying outside counsel. And, the district court was well within its discretion in dismissing the case without prejudice. Schlumberger would otherwise face significant prejudice in defending a lawsuit spurred and informed by Schlumberger's own former head of intellectual property, Rutherford— especially a suit alleging willful infringement *on Rutherford's own watch.*

## COUNTERSTATEMENT OF THE CASE

### A.     Factual Background

#### 1.     The Parties

Dynamic 3D Geosolutions LLC ("D3D") is a shell company formed for the purpose of holding the '319 patent and bringing infringement actions on it.  A3. D3D is a wholly-owned subsidiary of Acacia Research Group LLC ("ARG"), which is in turn a wholly-owned subsidiary of Acacia Research Corporation ("ARC"), a well-known patent licensing and assertion company.  A3; A1258-64. Toward the end of 2013, Acacia[1] acquired the '319 patent from Austin Geomodeling, Inc. ("Austin Geomodeling"), formed D3D, and assigned the '319 patent to D3D.  A3; A1265-67; A3851-52.  Shortly thereafter, D3D brought the present action against Schlumberger.  A93-104.

D3D has no employees.  A751-52 (36:22-37:1).  All actions taken on D3D's behalf in this case are controlled by Acacia's in-house legal department working together with outside counsel, Collins, Edmonds, Pogorzelski, Schlather & Tower, PLLC ("Collins Edmonds").  A617-20; A782-83 (103:19-104:4).

Schlumberger has been a leader in the oil and gas exploration and production business for more than 80 years.  It spends approximately $1 billion per year to research and develop new technologies and has a network of over 100

---

[1]   Hereafter, ARG and ARC are referred to as "Acacia."

research and engineering technology centers worldwide.  D3D's complaint alleges that Schlumberger's Petrel E&P Software Platform ("Petrel") infringes the '319 patent.  A3.  Petrel is a software application for three dimensional visualization, mapping, and reservoir modeling.  *Id.*

### 2.     Rutherford Served As Schlumberger's Deputy General Counsel For Intellectual Property

In 2006, Schlumberger hired Charlotte Rutherford as a senior intellectual property attorney.  A4; A787 (114:13-24).  In 2009, she was promoted to Director of Intellectual Property and, thereafter, became Deputy General Counsel for Intellectual Property.   A4; A801-02 (141:25-142:5); A956-58.   In that role, Rutherford developed, implemented, and oversaw Schlumberger's "worldwide IP strategy," including monetization (*e.g*., licensing), enforcement (*e.g*., litigation), procurement (*e.g.*, prosecution), and business operation.  A9; A958; A787-93; A795; A803-05; A845-59; A1278-81.  She was responsible for "protecting and preserving [Schlumberger's] IP assets including patents, trademarks and trade secrets by establishing and maintaining best practices and procedures," as well as "[a]dvis[ing] senior Company executives regarding risk issues relating to IP, and obtain[ing] legal opinions as needed."  A956-58; *see also* A804-05 (171:9-172:7).

In her role as in-house counsel for Schlumberger, Rutherford personally represented Schlumberger in matters relating to versions of the Petrel product that are materially identical to the versions of Petrel accused of infringement in this

case—the allegedly infringing features and functionality "existed in versions 2005, 2007, 2008, 2009, 2010, 2011, 2012, and 2013 of Petrel."  A1145-46; *see* A9.

For example, in 2007, Rutherford provided counsel with respect to a 12-person team responsible for performing a so-called "Goldstar" assessment (*i.e.*, an exhaustive analysis) of Schlumberger's Petrel product for the dual purposes of assessing risk of lawsuits against it and broadening Petrel's intellectual property coverage.  A4; A846-51.  In particular, the assessment involved: (1) analyzing the patent portfolio, competitive landscape, and business and intellectual property strategies of Petrel and Petrel's competitor products, including Austin Geomodeling's RECON software product;[2] (2) mapping Petrel as it existed in 2007, Petrel as it was expected to exist in future versions, and Petrel's competitor products; and (3) planning to strengthen intellectual property coverage for Petrel, including filing new patent applications and acquiring technology via licensing and acquisitions.  A847-50.  As the Goldstar "coordinator," Rutherford attended numerous meetings with fellow in-house counsel, received written reports for each phase of the analysis, and participated in Schlumberger's retention of outside counsel to perform patent strategy analysis for the Petrel product.  A846-51.

---

[2]   RECON is a predecessor to RECON 3.0, which D3D contends Schlumberger "unlawfully appropriated" and is covered by the '319 patent.  A847-48; A96-98.

Also, in 2007, Rutherford managed a lawsuit involving Petrel—a copyright infringement action that Schlumberger brought in Canada. A795-97 (124:12-126:16); A972-84. She reviewed and approved the complaint and other materials describing the Petrel software, Schlumberger's "standard licensing terms," "the value of the Petrel software (*e.g.*, licensing rates and streams)," and the harm and damages Schlumberger incurred from the infringing activities. A974-75 (¶¶ 7, 10-11). Indeed, "[o]n virtually every important matter, Ms. Rutherford was directly and personally involved"—including "assessing the strength of [Schlumberger's] case, formulating … litigation strategy, and formulating settlement goals and discussions." A975-76 (¶ 15). Rutherford also worked with outside counsel on other Schlumberger patent and trademark cases, and she was "personally involved" in litigation and settlement strategy in those cases as well. A976 (¶ 17).

On February 28, 2013, while still Schlumberger's Deputy General Counsel for Intellectual Property, Rutherford interviewed at Acacia's offices for the position of Senior Vice President and Associate General Counsel. She accepted Acacia's offer of employment on April 10, 2013, and started performing work on Acacia's behalf (including on her Schlumberger computer) prior to leaving Schlumberger at the end of May 2013. A807 (255:12-20).

### 3. Rutherford Counseled Acacia To Acquire The '319 Patent And Sue Her Former Client Schlumberger On It

At the beginning of June 2013, Rutherford formally started at Acacia as its Senior Vice President and Associate General Counsel. A812-15; A880-81. Acacia hired Rutherford to establish and direct Acacia's efforts to find, acquire, and assert patents against defendants in the energy industry. A880-81. Immediately after arriving at Acacia, Rutherford began participating in Acacia's decision to acquire the '319 patent and sue Schlumberger for infringement of the '319 patent.

In July 2013, Rutherford and others from Acacia met twice with the '319 patent's inventors (of Austin Geomodeling) to discuss Acacia's possible acquisition of the '319 patent. A12; A755-57 (58:14-60:1); A762-63 (68:3-69:12); A3448 (71:6-7). Rutherford admitted that, at both meetings, (1) she was acting as an attorney for Acacia, and (2) Schlumberger was identified as a potential target to be sued on the patent. A12; A760 (65:4-20); A764 (70:6-19); A828 (37:10-25). The inventors displayed a PowerPoint presentation addressing, among other things, Schlumberger, its Petrel product, and its "competitive licensing" of the patent. A3173, A3179-80, A3182, A3185, A3199, A3202-03. After the first meeting, Rutherford requested (and received) a copy of the slide that had details about the industry-leading "market competitors," including, prominently, Schlumberger. A3215; A3199. Rutherford did not excuse herself from either meeting. A12; A771-74 (82:18-85:13).

Thereafter, Rutherford participated in another call with the '319 patent's inventors, along with: (1) Matthew Vella (Acacia's CEO, an attorney and a member of Acacia's in-house legal department); (2) Gary Fischman (an Acacia IP attorney who reported directly to Rutherford and later managed all six '319 patent infringement cases while acting as D3D's in-house licensing attorney); and (3) Michael Collins (named shareholder at outside counsel, Collins Edmonds). A755-56 (58:21-59:1); A764-65 (70:24-71:17); A781-83 (102:16-20, 103:20-104:4); A1255-56.  Rutherford testified that the call was conducted in anticipation of litigation.  A765 (71:17-19).  Rutherford purportedly removed herself from this call (and only this call) when Schlumberger was discussed.  A1389 (72:13-17).

Rutherford was involved in negotiating the terms of the agreement assigning the '319 patent from Austin Geomodeling to Acacia and personally approved Acacia's valuation of Austin Geomodeling's patent portfolio (based on projected revenue that could be generated by licensing the '319 patent to Schlumberger and other companies).  *See* A12; A758-59 (63:24-64:9); A766 (77:14-16); A828 (37:10-25); A3256-62 (log nos. 1-2, 5-8, 10, 13, 19-20, 30-31); A3199-204; A3535-37; A3667-75 (log nos. 2-4, 6-21, 24, 27, 34, 35); A3645-46 (log. no. 1B);

A3841-42.  On August 20, 2013, Acacia and Austin Geomodeling entered into a contingent patent assignment agreement.  *See* A2188 (¶ 4); A3852; A3.[3]

Rutherford later received recommendations from Fischman and Collins that Acacia acquire the '319 patent and sue Schlumberger.  A12; A768-70 (79:17-81:5).  Thereafter, Rutherford approved ("concurred" in) the recommendations to acquire the '319 patent and to sue Schlumberger.  *Id.*; A771 (82:8-17); A775-77 (86:6-88:15); A779-80 (99:11-100:5); A825-27 (27:2-4, 27:10-12, 31:11-18, 35:7-23); A3595.  She also communicated her approval to Acacia's outside counsel.  A774-77 (85:19-86:13, 87:7-88:15); A825-27 (27:5-18, 31:11-18, 35:7-23).  Rutherford testified that she was acting as Acacia's lawyer when she reviewed and approved those recommendations.  A12; A801 (141:20-24).

With Rutherford's recommendations in-hand, Fischman and Collins Edmonds made the same presentation to Acacia CEO Michael Vella.  A776-77 (87:15-88:10).  With the benefit of Rutherford's approval, Vella authorized completing the acquisition of the '319 patent and suing Schlumberger.  A777 (88:11-15); A3545-47.  On November 18, 2013, Acacia finalized the '319 patent's acquisition.  A3; A3850; A3852.

---

[3]  Over several months, Rutherford and Fischman drafted PowerPoint slides describing Acacia's anticipated litigation involving the '319 Patent.  A3259-61 (log nos. 14-15, 17, 21-27, 29).

On December 6, 2013, Acacia formed D3D, A1261-64, and promptly assigned the '319 patent to D3D. A98 (¶ 22). On December 9, 2013, Acacia announced that Rutherford had opened its Houston office—the unit responsible for "monetizing" Acacia's energy-related patents. A806 (241:1-21); A1147-49. The five-person office included Fischman and four other Acacia employees, all of whom reported to Rutherford. A753; A778; A781-83.

Shortly thereafter, Rutherford and Fischman jointly retained Collins Edmonds to represent D3D in the '319 patent litigation. A12; A784 (108:8-18). On January 29, 2014, Collins sent Fischman drafts of the complaints against Schlumberger and Halliburton—and Fischman forwarded them to Rutherford minutes later for her review. A3601-03. The draft complaint against Schlumberger alleged that, during and before Rutherford's tenure as Schlumberger's Deputy General Counsel for Intellectual Property, Schlumberger willfully infringed the '319 patent. A3571-84 (¶¶ 31, 33). Rutherford commented on that draft complaint against her former client: "Thanks Gary. Good job. Please extend my thanks to CEPIP [Collins Edmonds]. CR [Charlotte Rutherford]." A3601-03. That same day, she stated that she had "no objection" to filing the suit against Schlumberger. A3594-95.

## B.    District Court Proceedings

### 1.    D3D Sues Schlumberger Alleging Knowledge Of The Patent And Willful Infringement

On February 4, 2014, D3D filed complaints in the Western District of Texas against Schlumberger and Halliburton alleging infringement of the '319 patent. A93-104; A887-99.  Fischman promptly forwarded Rutherford emails from Collins informing her that the suits were filed, and she responded, "Outstanding."  A3604-07; *see also* A3608-14.   Fischman also repeatedly forwarded to Rutherford information about the litigation from Collins—including, for example, a privileged case assessment from Collins Edmonds and a description of a discussion Collins had with Schlumberger's counsel.  A3262 (log nos. 32, 33); A3647-48 (log. no. 4).

In its complaint, D3D accuses Schlumberger of directly infringing the '319 patent by using Petrel.  A99-100 (¶ 25).   D3D also alleges that Schlumberger indirectly infringed because it "had actual knowledge of the '319 patent since … the time of its issuance on July 26, 2011" and "specifically intended their direct and indirect customers to directly infringe the '319 patent and knew or should have known that the activities of the foregoing direct and indirect customers constituted such direct infringement."  A100-01 (¶¶ 27, 29).

D3D further alleges that Schlumberger "acted in an *objectively reckless manner*, which justifies a finding that their infringements have been *willful*" because, purportedly, Schlumberger: (1) "*studied the claims of these patents* and

compared them with the foregoing accused systems and methods, thereby obtaining knowledge of their infringements"; (2) "*must have been aware* of the objectively high likelihood that the accused systems and methods infringe the '319 patent because of the similarity of the key features of Defendant's Petrel E&P Software Platform and [Austin Geomodeling]'s patented RECON® software"; and (3) took "*no action to stop or lessen the extent of their own direct infringements*" or "to redesign the infringing systems and methods to avoid infringement." A102-03 (¶ 31) (emphasis added).

### 2.     Schlumberger Moves To Disqualify Rutherford And Others

On April 17, 2014, less than three weeks after its deadline to respond to the complaint, Schlumberger informed the district court of Rutherford's potential conflict. A107-09; *see also* A615-16. On April 22, the district court held a scheduling conference and discussed Rutherford's potential conflict—and Acacia's in-house counsel, Fischman, appeared as the "representative" of D3D. A201 (3:7-11). Thereafter, at the court's direction, the parties had multiple meetings and conversations regarding Rutherford's conflict, and Fischman consistently participated on behalf of D3D. A617-19. On August 15, shortly after the district court lifted a stay of proceedings in the case,[4] Schlumberger filed its motion to

---

[4]   The stay prohibited proceedings not related to claim construction.

disqualify Rutherford, Acacia's other in-house counsel (including Fischman and Vella), and D3D's outside law firm (Collins Edmonds). A701-10.[5]

On August 12, 2014, the district court issued an order authorizing limited discovery regarding the disqualification motion. A688 (38:14-20). On September 11, Schlumberger served subpoenas on D3D, Acacia, Fischman, Vella, Collins, the Collins Edmonds firm, and Rutherford, among others, seeking documents relevant to the disqualification motion. *See*, *e.g*., A2095-105. All resisted discovery. *See* A3051-62, A3101-02 (17:19-18:1); *In re Subpoenas*, No. A-14-CV-967-LY, ECF No. 31 (S.D. Tex. Nov. 7, 2014). After motions to quash by D3D, Acacia, Fischman, and Rutherford were denied (and Collins and Collins Edmonds agreed to produce documents through D3D), *see id*., they produced documents just days before the hearing on the disqualification motion, *see* A3158-60.[6]

On November 19, 2014, the day before the hearing, Schlumberger filed a supplemental submission providing the court with copies of some of the newly-

---

[5]   Schlumberger also filed a motion to dismiss under 35 U.S.C. § 101, which was denied as moot. *See* A114-19; A1.

[6]   On November 12, the district court held a technology tutorial and heard testimony from Dr. Martyn Beardsell—the Schlumberger employee "familiar with all versions of Petrel" and responsible for "designing and developing the Petrel software." A1145-46. Beardsell demonstrated the 2005 version of Petrel, which is prior art to the '319 patent. *See* A3406 (29:8-11), A3416 (39:22-24). Beardsell also submitted a declaration in support of Schlumberger's motion to disqualify, which the district court credited in its decision. *See* A9-10; A1144-46.

produced evidence.  A3158-70.  That same evening, counsel for Fischman and Acacia entered appearances for "the upcoming hearing on the motion to disqualify Rutherford filed by Defendants," filed a notice making certain legal and factual arguments, and submitted declarations from Fischman and Vella.  A3347-50; A3356-57; A3373-76.  On November 20, the district court held a hearing on the disqualification motion.  A3378-469.  After the hearing, Schlumberger filed a submission to pare down its supplemental evidence.  A3470-77.

On March 31, 2015, the district court entered its opinion and judgment granting Schlumberger's motion to disqualify and dismissing the suit without prejudice.  A2-15.  The district court first disqualified Rutherford because her work as a lawyer for Schlumberger was "substantially related" to her subsequent duties at Acacia.  A3-5, A9-10.  Because "Schlumberger ha[d] satisfied the substantial-relationship test," the court "irrebuttably presume[d] Rutherford acquired confidential information requiring that she be disqualified."  A9-10 (applying *In re American Airlines, Inc.*, 972 F.2d 605 (5th Cir. 1992)).  Next, the court determined that, in light of Rutherford's multiple interactions with other Acacia in-house counsel and outside counsel, they too must be disqualified.  A11-14.  Finally, the court dismissed the case without prejudice; the court explained that, because the complaint was drafted by attorneys presumed privy to Schlumberger's confidential

15

information, "Schlumberger will face significant prejudice" if the case is permitted to continue under these circumstances.  A14.

## SUMMARY OF THE ARGUMENT

Appellants couch this appeal as raising *twenty* issues.  D3D Br. 3-5; Acacia Br. 6-7.  But, at root, Appellants do nothing more than ask this Court to reweigh the evidence, second guess the district court's credibility determinations, and substitute its own factual findings as if it were a trial court.  Despite the district court's well-reasoned conclusions and factual findings, Appellants expressly seek *de novo* review.  That is improper.  The district court's order is reviewed for abuse of discretion and its factual findings are reviewed for clear error.  Far from any such error, the district court's disqualification of Rutherford, Acacia's other in-house counsel, and Acacia's outside counsel is well-supported—indeed, compelled—by the record.

First, it is bedrock Fifth Circuit law that if Rutherford's role in the present lawsuit against Schlumberger is "substantially related" to her prior representation of Schlumberger, then she is irrebuttably presumed to possess Schlumberger's confidential information.  *American Airlines*, 972 F.2d at 614, 619.  The district court correctly found such a "substantial relationship."  At Schlumberger, Rutherford was in charge of Schlumberger's worldwide intellectual property strategy (including licensing and litigation).  Her duties included ensuring that

Schlumberger's Petrel product had intellectual property protection and did not risk infringing others' intellectual property. That product is identical in all material respects to the Petrel software product accused of infringement in this case. Moreover, the present suit accuses Schlumberger of *willful* infringement during Rutherford's tenure at Schlumberger—an issue that goes directly to Rutherford's own conduct and state of mind while at Schlumberger. There can be no legitimate dispute that the present suit against Schlumberger is "substantially related" to Rutherford's prior representation of Schlumberger.

Second, under Fifth Circuit law, because she personally represented Schlumberger on substantially related matters, Rutherford's disqualification is imputed to Acacia's in-house attorneys, who, like Rutherford, are irrebuttably presumed privy to Schlumberger's confidences. The district court's disqualification of the in-house attorneys can be affirmed on that basis alone. Even if, as the district court held, D3D has an opportunity to rebut that presumption, the district court correctly found that it failed to do so. The district court also affirmatively found that Rutherford communicated confidential Schlumberger information to Acacia's other in-house counsel. That finding, too, is well-supported because, in conveying her approval of the suit against Schlumberger, Rutherford inherently conveyed her belief (informed by intimate knowledge of her former client) that the allegations, including willful infringement, were well-

founded—like a company executive who conveys inside information by suggesting that "now is a good time to sell stock."

Third, under Fifth Circuit law, because Rutherford and Acacia's other in-house counsel had substantial contact and communication with Collins Edmonds (Acacia's outside counsel) in the course of bringing the present and related suits, a rebuttable presumption arises that Collins Edmonds was likewise privy to Schlumberger's confidential information. The district court correctly found that the presumption was not rebutted and that Collins Edmonds, like Acacia's in-house counsel, did in fact receive confidential Schlumberger information.

Fourth, the district court acted well within its discretion in dismissing the suit without prejudice. The court reasonably found that Schlumberger would otherwise face significant prejudice in defending a suit influenced by its former head of intellectual property. Other courts have similarly dismissed without prejudice where, as here, the circumstances warrant.

Finally, Acacia's due process challenge, raised for the first time in this Court, is baseless. Acacia had ample notice and opportunity to participate below.

The district court's disqualification order and dismissal without prejudice should be affirmed.

# ARGUMENT

## I.    STANDARD OF REVIEW

The district court's order disqualifying counsel is reviewed for abuse of discretion under Fifth Circuit law. *Kennedy v. MindPrint (In re ProEducation Int'l, Inc.)*, 587 F.3d 296, 299 (5th Cir. 2009). Factual findings are reviewed for clear error and legal questions are reviewed *de novo. Id.*; *see also* Fed. R. Civ. P. 52(a)(6) ("Findings of fact … must not be set aside unless clearly erroneous ….").

Under the clearly-erroneous standard of review, this Court may not "duplicate the role of the lower court." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 574. As long as "the district court's account of the evidence is plausible in light of the record viewed in its entirety," this Court "may not reverse it even though convinced that … it would have weighed the evidence differently." *Id.* at 573-74. When an appellant "merely contests the district court's adverse factual findings by asserting contrary testimony[,] that is simply insufficient to overturn the district court." *Nielsen v. United States*, 976 F.2d 951, 956 (Fed. Cir. 1992); *see also Williamson v. Brown*, 646 F.2d 196, 200 (5th Cir. 1981) ("[T]he reviewing court is not to retry the issues or to substitute its judgment for that of the district court."); *In re Hyundai Motor Am.*, 185 F. App'x 940, 941 (Fed. Cir. 2006) (rejecting

19

challenge that was "essentially a factual dispute, which the district court resolved in … favor" of disqualification based on "a hearing, … competing declarations, and … pertinent documents").

This Court must "construe the [district] court's findings liberally and find them 'to be in consonance with the judgment, so long as that judgment is supported by evidence in the record.'" *Colonial Penn Ins. v. Mkt. Planners Ins. Agency Inc.*, 157 F.3d 1032, 1037 (5th Cir. 1998); *see Rex-Tech Int'l LLC v. Rollings (In re Rollings)*, 451 F. App'x 340, 351-52 (5th Cir. 2011).

## II.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DISQUALIFYING COUNSEL

In the Fifth Circuit, "[w]hen considering motions to disqualify, courts should first look to 'the local rules promulgated by the local court itself.'" *ProEducation*, 587 F.3d at 299.   Under the Local Rules of the Western District of Texas, "[m]embers of the bar … and any attorney permitted to practice … must comply with the standards of professional conduct set out in the Texas Disciplinary Rules of Professional Conduct."   W.D. Tex. Ct. R. AT-7(a).   The Fifth Circuit also considers the ABA Model Rules.  *ProEducation*, 587 F.3d at 299.

### A.  The District Court Did Not Abuse Its Discretion In Disqualifying Rutherford

In the Fifth Circuit, an attorney may not be adverse to a former client in a matter that is "substantially related" to her representation of the former client.

*American Airlines*, 972 F.2d at 614; *see also In re Columbia Valley Healthcare Sys., L.P.*, 320 S.W.3d 819, 824 (Tex. 2010). There is a "substantial relationship" if the attorney's work for her former client was "akin to the present action in a way reasonable persons would understand as important to the issues involved." *American Airlines*, 972 F.2d at 618-19.

If the "substantial relationship" test is satisfied, "the court will irrebuttably presume that relevant confidential information was disclosed during the former period of representation"—"[t]he test is categorical in requiring disqualification." *Id.* at 614. That is, "the court will *assume* that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation. *It will not inquire into their nature and extent*." *Id.* (emphasis added). Moreover, "because the substantial relationship test is concerned with both a lawyer's duty of confidentiality *and* his duty of loyalty, a lawyer who has given advice in a substantially related matter *must be disqualified, whether or not he has gained confidences*." *Id.* at 619 (second emphasis added).

### 1. Far From Being Clearly Erroneous, The District Court's Finding Of A Substantial Relationship Was Compelled By The Factual Record Before The Court

The district court found as a factual matter that Rutherford's prior representation of Schlumberger was "substantially related" to her work for Acacia

regarding the present suit against Schlumberger.  A9-10.  Not only is the district court's finding not clearly erroneous—it is *compelled* by the factual record.

As a senior intellectual property lawyer at Schlumberger, Rutherford personally represented Schlumberger in all aspects of its intellectual property litigation and licensing activities.  *Supra* at 5-7.  For example, she led the team responsible for examining the intellectual property rights and risks associated with Schlumberger's Petrel product (the same product line that Acacia accuses of infringement in the present suit) and with competitors' products.  *Supra* at 6.  That analysis included, among other things, determining whether other companies owned patents that arguably covered Petrel's features, thereby putting Schlumberger at risk of infringement liability.  *Id*.  Rutherford also directly managed a copyright lawsuit over Petrel and the resulting settlement negotiations, which involved analysis of, among other things, Petrel's value in light of licensing rates and associated revenue streams.  *Supra* at 7.

Within one month of her departure from Schlumberger, Rutherford began to counsel Acacia in its decision to acquire the '319 patent and to file this lawsuit accusing Schlumberger's Petrel product of willful patent infringement—repeatedly meeting and discussing the matter with the '319 patent inventors, other Acacia attorneys and non-attorney personnel, and outside counsel.  *Supra* at 8-11.  Acting in her admitted legal role now as Acacia's Associate General Counsel, Rutherford

received and concurred in recommendations from her fellow Acacia in-house counsel (Fischman) and Acacia's outside counsel (Collins Edmonds) that Acacia acquire the '319 patent and file suit against her former client Schlumberger. A12; *supra* at 10. Rutherford provided approving feedback on outside counsel's draft complaint against Schlumberger before its filing. *Supra* at 11; A3602-03. Rutherford further confirmed that she had no objection to filing the suit against Schlumberger. *Supra* at 11; A3595.[7]

D3D's allegations in the present suit directly implicate legal and factual issues that are substantially related to Rutherford's former representation of Schlumberger in at least three ways.

First, in this suit, Petrel is the only product accused of infringement. That alone demonstrates a "substantial relationship" because, as discussed, at Schlumberger, Rutherford led and was personally involved in analyzing—and providing legal counsel to Schlumberger on—whether Petrel's features and functionality read on the intellectual property rights of others, including Austin

---

[7] Contrary to Appellants' mischaracterization, the evidence of Rutherford's concurrence and role in the litigation is not limited to "selecting the button called 'I have no objection'" just days before filing suit. Acacia Br. 17 (quoting A3595, dated Jan. 29, 2014). Rutherford repeatedly testified that she approved of Acacia's course of action even before Acacia acquired the patent (in November 2013)—long before her final sign-off on the suit. *Supra* at 10-11. The district court properly credited Rutherford's testimony on this topic. A12.

Geomodeling, the then-owner of the '319 patent. *Supra* at 6. The features of Petrel accused in this suit are the same as those that existed during Rutherford's tenure, as the district court found and Schlumberger's uncontroverted testimony established. A9; A1145-46 (¶ 5) (Beardsell declaration). Rutherford's subsequent representation of Acacia with respect to its infringement contentions was, therefore, substantially related to her prior representation of Schlumberger concerning Petrel.[8]

Second, D3D's allegations that Schlumberger *willfully* infringed the '319 patent directly implicate Rutherford's conduct and state of mind at Schlumberger. D3D claims that Schlumberger "acted in an objectively reckless manner, which justifies a finding that their infringements have been willful" because Schlumberger purportedly "studied" the '319 patent and was "aware of the objectively high likelihood that the accused systems and methods infringe the '319 patent," yet "t[ook] no action to stop or lessen" the alleged infringement. A969-70 (¶ 31); *see also* A970 (¶¶ 32-33) (alleging Schlumberger had "actual notice of the ['319 Patent] since … August 8, 2011").

Those allegations unequivocally implicate Schlumberger's conduct, knowledge, and state of mind during the period when Rutherford *herself* was in

---

[8]   In addition, the 2005 version of Petrel is prior art to the '319 patent and central to Schlumberger's invalidity contentions. *See* A1861-932, 1934-2002, 2005-74.

charge of Schlumberger's IP enforcement, risk assessment policies, and conduct (*i.e.*, from the '319 patent's issuance in 2011 until Rutherford's departure in 2013). It was within *Rutherford*'s scope of responsibility at Schlumberger to determine whether Austin Geomodeling or other competitors had patents that posed a risk, to ensure that Schlumberger did *not* act in an objectively reckless manner regarding such patents, and to determine whether to obtain a legal opinion to protect against allegations of willful infringement. *Supra* at 5. In effect, the present suit (which Rutherford approved) alleges that Rutherford failed in her job while at Schlumberger—she is likely a fact witness.

Third, Rutherford's representation of Schlumberger and her involvement with Acacia in the present matter are substantially related because both involved assessing Petrel's economic value. In the present case, Acacia's decision to acquire the '319 patent and file suit against Schlumberger in the first place depended on whether Acacia believed Schlumberger would value Petrel enough to take a license, and if so in what amount. In the '319 patent inventors' sales pitch to Acacia, the value of the '319 patent was premised largely on the financial information of Schlumberger and Halliburton. A3508-11. And Rutherford personally approved the valuation of Austin Geomodeling's patent portfolio. *Supra* at 9. Similarly, one of the key damages issues in this case is the calculation of a reasonable royalty rate, *see* D3D Br. 25 ("determining a reasonable royalty" is

one of "the primary factual issues"); A1304 (same), which turns in part on the "rates paid by the licensee for the use of comparable patents." *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1239 n.3 (Fed. Cir. 2011).

Rutherford's representation of Schlumberger is, therefore, substantially related because she was specifically involved in valuing Petrel at Schlumberger—for example, in the Goldstar analysis (which assessed Petrel's intellectual property risks and protections) and in the Petrel copyright suit (in deciding to file suit and formulating settlement goals). *Supra* at 6-7. And, more generally, at Schlumberger, Rutherford was in charge of licensing intellectual property rights, meaning she was well aware of the rates Schlumberger paid or received to license other patents. *See* A9; A787-88 (114:25-115:12); A958.

Any one of these issues establishes a substantial relationship between Rutherford's legal work for Schlumberger and her legal work for D3D and Acacia. Collectively, they leave no doubt that Rutherford's work as Schlumberger's Deputy General Counsel for Intellectual Property was "akin to the present action in a way reasonable persons would understand as important to the issues involved." *American Airlines*, 972 F.2d at 618-19. No "reasonable person" could think otherwise. Consequently, Rutherford "must be disqualified, whether or not [she] has gained confidences." *Id.* at 614.

This Court has recognized a substantial relationship in far less egregious circumstances. In *In re Riles*, a Texas district court disqualified attorneys who had previously represented the opposing party because in prior patent matters (none involving the patent-in-suit) the attorneys were "privy" to, among other things, "information regarding [their former client's] litigation and settlement strategies in infringement actions." 243 F.3d 553, 2000 WL 1062086, at *1, *2-3 (Fed. Cir. July 20, 2000). This Court upheld the district court's substantial relationship finding and disqualification of counsel. *Id.* at *3; *see also In re Apeldyn Corp.*, 391 F. App'x 873, 874 (Fed. Cir. 2010) ("substantial relationship" where attorney was "exposed to factors that [the defendant] considers important in settlement"). Given the common involvement of the Petrel product, and because Rutherford's conduct and state of mind bear directly on the willfulness allegations, the substantial relationship is even more evident here.

### 2.    Appellants Improperly Ask This Court To Reweigh The Evidence And Make Contrary Findings As A Trier Of Fact

Appellants make several arguments, each of which amounts to asking this Court to reweigh the evidence, act as the trier of fact, and make different factual findings. Appellants' arguments fail.

First, Appellants argue that the district court erred in relying on Schlumberger's "'privilege-type' log," repeatedly asserting that the log was

"unsworn." D3D Br. 3, 9, 20-23.[9] But Schlumberger's counsel submitted a declaration expressly attesting "under penalty of perjury" that the summaries are accurate (A1279-80)—which, by statute, has the effect of a sworn declaration. 28 U.S.C. § 1746. It was entirely proper to consider such evidence. Indeed, the district court expressly rejected D3D's hearsay and best evidence objections to the log, A3467 (90:12-20); A3153-54, and Appellants do not challenge that evidentiary ruling.

Moreover, Schlumberger made the underlying documents available for *in camera* review, but the district court found it unnecessary. Although Appellants find it "telling" that Schlumberger declined to submit the documents (D3D Br. 22), the purpose of the "substantial relationship" test is to "avoid[] compelling the former client to prove the very things that [it] seeks to keep confidential." *Kraft, Inc. v. Alton Box Bd. Co. (In re Corrugated Container Antitrust Litig.)*, 659 F.2d 1341, 1347 (5th Cir. 1981). In any event, the district court did not place undue weight on the document log (indeed, did not cite it) and instead properly considered the record as a whole. *See, e.g.*, A1-2, A9-10, A12-13.

Second, Appellants argue that there is no substantial relationship because Rutherford dealt with the 2005 version of Petrel, not the current (accused) version.

---

[9]   Acacia incorporated D3D's arguments. Acacia Br. 3 n.1.

D3D Br. 25.  This argument is a direct challenge to the district court's decision to credit Beardsell's declaration that the accused features of Petrel have not changed since the 2005 version.  *See* A9.  Appellants argue that Beardsell's declaration "strains credulity" and is "vague and inconclusive."  D3D Br. 25.  But the courts of appeals cannot revisit such credibility determinations or reweigh the evidence. *Supra* at 19-20; *Schlesinger v. Herzog*, 2 F.3d 135, 139 (5th Cir. 1993) (findings based on "credit[ing] [witness] testimony" are "virtually never … clear error"). Beardsell—who was the Schlumberger employee responsible for "designing and developing the Petrel software" and was "familiar with all versions of Petrel"— testified that "[t]he features and functionality identified by Dynamic 3D as allegedly infringing existed in versions 2005, 2007, 2008, 2009, 2010, 2011, 2012, and 2013 of Petrel."    A1145-46 (¶¶ 3, 5).    Beardsell's testimony was *uncontradicted by any evidence below* and, tellingly, D3D declined to depose him. A1801.  Even now, Appellants *do not deny* that the relevant features are the same. The district court did not err in accepting Beardsell's testimony.

Third, Appellants wrongly argue that the district court ignored the supervisory nature of Rutherford's role at Schlumberger, relying on ABA Formal Ethics Opinion 99-415.  D3D Br. 31-33.  In that opinion, the ABA recognized that personal representation is established by: (1) "[d]irect involvement in the matter"; or (2) "a style of supervision that results in access to material information

concerning a matter." ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 99-415 at 2 (1999). Here, Rutherford was "direct[ly] involve[d]" in Petrel-related matters, such as the copyright lawsuit: she managed outside counsel and "was directly and personally involved" in "virtually every important matter" and "was very involved in assessing the strength of [Schlumberger's] case, formulating [Schlumberger's] litigation strategy, and formulating settlement goals and discussions." A976 (¶ 15); *supra* at 5-7. Rutherford also had "access to material information" concerning Schlumberger's monetization projections and targets, assessments of intellectual property risks and protections for Petrel, settlement strategies, and valuations of Petrel and competitor's products. A846-59; *supra* at 5-7.[10]

Fourth, Appellants argue the district court "fail[ed] to engage in a painstaking analysis of the facts" under a "three-factor analysis" that some district courts have applied. D3D Br. 24. But the district court explained the facts in detail. A3-5, A9-10. Appellants themselves do not—and could not—contend that a "three-factor analysis" is *required* by binding Fifth Circuit precedent. The Fifth Circuit made no reference to that analysis in its most recent opinion on the

---

[10]  *See also Wai Hoe Liew v. Cohen & Slamowitz, LLP*, 2015 WL 5579876, at *3, *11 (E.D.N.Y. Sept. 22, 2015); *Carreno v. City of Newark*, 834 F. Supp. 2d 217, 227-32 (D.N.J. 2011).

substantial relationship test.  *See ProEducation*, 587 F.3d at 296; *cf. O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 449 F. App'x 923, 929 (Fed. Cir. 2011) (Fed. R. Civ. P. 52(a) "does not require 'elaborate, detailed findings on every factual issue raised.'").[11]

Appellants repeatedly argue that the district court "disregard[ed] or fail[ed] to give proper weight to evidence."  D3D Br. 24; *see also*, *e.g.*, *id.* at 31, 38; Acacia Br. 2, 58-61.  But "[t]he district court did not ignore facts.  It simply found facts contrary to the appellants' liking."  *Schlesinger*, 2 F.3d at 139.  The district court permissibly declined to credit Appellants' evidence, especially given the multiple occasions where Appellants' self-serving accounts were contradicted by other evidence.  For example, Appellants' contention that Rutherford's only recommendation was to proceed in litigation against Halliburton (not Schlumberger), A1295; D3D Br. 14, was contradicted by Rutherford's repeated testimony that she "concurred" in the decision to sue Schlumberger, *supra* at 10.

It is not this Court's role to reweigh the evidence or "substitute its judgment for that of the district court."  *Williamson*, 646 F.2d at 200.  The district court's finding that Rutherford's prior representation of Schlumberger was substantially

---

[11]  Unlike the California-based three-part test, Fifth Circuit precedent requires disqualification even where no confidences were disclosed.  *Compare American Airlines*, 972 F.2d at 618, *with Dieter v. Regents of the Univ. of Cal.*, 963 F. Supp. 908, 911-12 (E.D. Cal. 1997).

related to her representation of Acacia in this matter is well-founded—indeed, it is compelled by the record. Under Fifth Circuit law, it follows that she is irrebuttably presumed privy to Schlumberger's confidences and "categorical[ly]" disqualified, as the district court correctly held. *See American Airlines*, 972 F.2d at 614.

## B. The District Court Did Not Abuse Its Discretion In Disqualifying Acacia's Other In-House Counsel

The district court did not abuse its discretion in disqualifying Acacia's other in-house attorneys, for three independent reasons. First, under Fifth Circuit law, once it is established that Rutherford personally represented Schlumberger on a substantially-related matter, there is an irrebuttable presumption that she shared Schlumberger's confidences with the other lawyers at Acacia. Second, even if (as the district court incorrectly held and Appellants incorrectly argue), the presumption is *rebuttable*, the district court did not "clearly err" in finding that D3D failed to rebut that presumption. Third, even if (as Appellants also incorrectly argue), there were *no* presumption, the district court did not "clearly err" in finding that Rutherford did, in fact, share confidences.

### 1. Under Fifth Circuit Law There Is An Irrebuttable Presumption That Rutherford Shared Confidences With The Other Acacia In-House Counsel

Appellants' principal argument is that there is no irrebuttable presumption that Rutherford shared confidential information of her former client

(Schlumberger) with her new firm (Acacia's in-house counsel).   D3D Br. 33;

Acacia Br. 41-51.[12]  Fifth Circuit and Texas law refute Appellants' argument.

The Fifth Circuit, drawing on Texas disciplinary standards, has long

recognized an "*irrebuttable* presumption … that confidences obtained by an

individual lawyer will be shared with the other members of his firm." *American

Airlines*, 972 F.2d at 614 n.1 (emphasis added).   For example, in *Corrugated

Container Antitrust Litigation*, the Fifth Circuit irrebuttably presumed, first, that

"confidential information has been given to the attorney actually doing work for

the client" and, second, that "the attorney shared the information with his [firm]

partners."  659 F.2d at 1346.  In disqualifying the entire firm, the court explained

that it "makes no difference" whether other attorneys in the firm actually "gave

advice or received information regarding those matters."  *Id.* at 1345-46; *see also

American Can Co. v. Citrus Feed Co*., 436 F.2d 1125, 1129 (5th Cir. 1971)

("disqualification extends to partners and employees" of the directly disqualified

attorney); *ProEducation*, 587 F.3d at 303 (recognizing that where an attorney

personally represented a client, all attorneys at the attorney's firm are

"conclusively disqualified by imputation").

---

[12]  Appellants do not contest that Acacia's in-house legal department is a "firm"
subject to disqualification.  *See* Tex. Disciplinary R. Prof'l Conduct, *Terminology*
at 7; Restatement (Third) of Law Governing Lawyers § 123 cmt. d(i) (2000).

Texas law similarly recognizes that there is an irrebuttable presumption of shared confidences where an attorney has worked for a client:

> When the [disqualified] lawyer moves to another firm and the second firm represents an opposing party to the lawyer's former client, a second *irrebuttable* presumption arises—that the lawyer has *shared* the client's confidences with members of the second firm. The effect of this second presumption is the *mandatory* disqualification of the second firm.

*In re Guar. Ins. Servs., Inc.*, 343 S.W.3d 130, 134 (Tex. 2011) (emphasis added); *see also Columbia Valley*, 320 S.W.3d at 824. That presumption is necessary because "it would always be virtually impossible for a former client to prove that attorneys in the same firm had not shared confidences"; the presumption also protects client security and "the integrity of the legal practice." *Nat'l Med. Enters., Inc. v. Godbey*, 924 S.W.2d 123, 131 (Tex. 1996).

In *Henderson v. Floyd*, 891 S.W.2d 252, 254-55 (Tex. 1995), the court disqualified a firm from representing the plaintiff because an associate at the firm had previously represented the defendant while at another firm. Although the associate purportedly did not disclose any confidential information to the new firm and was shielded from any contact with the adverse litigation, the court applied the irrebuttable presumption and disqualified the associate's new firm. *Id.* at 254.

Under this long-established standard, when Rutherford joined Acacia's in-house counsel team, she was irrebuttably presumed to have shared Schlumberger's

confidences. Thus, disqualification of all other Acacia in-house counsel was conclusive and mandatory.

Appellants' reliance on *ProEducation* (D3D Br. 33-34; Acacia Br. 43-45, 62-63) is misplaced for three reasons. First, unlike Rutherford, the migrating attorney in *ProEducation* did not "*personally*" represent the former client at his former firm—the former client was only personally represented by *others* at his former firm. *ProEducation*, 587 F.3d at 303 (emphasis added). The Fifth Circuit held that, in such circumstances, "the transferring lawyer is no longer deemed to have imputed knowledge about his former firm's client" and, in turn, there is no irrebuttable presumption of imputed knowledge to the migrating attorney's new firm. *Id.* (quoting Amon Burton, *Migratory Lawyers & Imputed Conflicts of Interest*, 16 Rev. Litig. 665, 684-85 (1997)). Thus, "migrating attorneys [have] the opportunity to remove imputed disqualification"—but only by showing that they neither personally worked for, nor obtained confidences of, the former client. *Id.* at 304. That holding is inapplicable where, as here, the migrating attorney, Rutherford, *did* personally represent her former client, Schlumberger. If anything, *ProEducation* supports disqualification in this case because the Fifth Circuit recognized that the firm of a *directly* disqualified attorney *would* be "conclusively disqualified by imputation." *Id.* at 303.

35

Second, *ProEducation* relies predominantly on the Texas Disciplinary Rules of Professional Conduct enacted in 1990. *See id.* at 300-04 & n.2; Acacia Br. 44.[13] *ProEducation* favorably cites (and distinguishes) Texas Supreme Court precedent, *Henderson*, 891 S.W.3d at 254, which applied the irrebuttable presumption that a directly disqualified attorney shares confidences with her new firm. *ProEducation*, 587 F.3d at 300 n.3. After *ProEducation*, the state high court twice confirmed that there still *is* such an irrebuttable presumption. *Guar. Ins. Servs.*, 343 S.W.3d at 134; *Columbia Valley*, 320 S.W.3d at 824.[14]

Finally, in *ProEducation*, the Fifth Circuit relied heavily on Professor Burton's article, which expressly recognized that where "the transferring lawyer personally represented the complaining former client," her conflict is irrebuttably imputed to the attorneys in her new firm. Burton, *supra,* 16 Rev. Litig. at 679. Burton also testified in the present case that, in light of Rutherford's work on substantially related matters, "all in-house lawyers at Acacia" are "irrebuttabl[y] presum[ed]" to have the same information as Rutherford and are likewise disqualified. A1180-81 (¶¶ 28-29). The district court's disqualification of

---

[13] *ProEducation* applies Comment 7 to Rule 1.09, which addresses the disqualification standard when, unlike here, the migrating attorney *did not* "personally" represent a former client. 587 F.3d at 300.

[14] *See also* Tex. Prof'l Ethics Comm., Formal Op. 598 at 2 (2010) (irrebuttable presumption); *OneBeacon Ins. Co. v. T. Wade Welch & Assocs.*, 2012 WL 393309, at *6 (S.D. Tex. Feb. 6, 2012) (same, distinguishing *ProEducation*).

Acacia's in-house counsel should be affirmed based on that irrebuttable presumption alone. *Guar. Ins. Servs.*, 343 S.W.3d at 134; *Columbia Valley*, 320 S.W.3d at 824.

> **2.    Even If The Presumption Were Rebuttable, The District Court Properly Found D3D Failed To Rebut The Presumption That Rutherford Shared Confidences With Other Acacia In-House Counsel**

The district court gave D3D the benefit of a favorable (but legally incorrect) interpretation of Fifth Circuit law and Texas disciplinary standards in allowing D3D to attempt to rebut the presumption that Rutherford shared confidences with other Acacia in-house counsel. But the district court properly found that D3D failed to rebut the presumption.

If the presumption were rebuttable, it would be at least as strong as the rebuttable presumption that applies to *non*-attorneys in Texas that move to a new firm. *See*, *e.g.*, *Guar. Ins. Servs.*, 343 S.W.3d at 134; *Columbia Valley*, 320 S.W.2d at 825-26. When a non-attorney works on a client matter or receives a client's confidential information at one firm, and then moves to a second firm, Texas law presumes that she shares that client's confidences with all attorneys at the second firm. The presumption is rebutted *only* upon a showing that the new employer instructed the employee not to work on any matter on which she worked during her prior employment and took "'other reasonable steps'" to "effectively

37

screen" the employee from working on such matters. *Columbia Valley*, 320 S.W.2d at 825; *see id*. at 824-25 (factors to assess effective screening).

The undisputed record here confirms that there was no screen, much less an "effective" screen; thus, D3D did not rebut the presumption of shared confidences. Although D3D and Collins Edmonds initially represented, repeatedly, to the district court (without record support) that Rutherford was screened, *see* A708; A206 (8:14-23); A869, A874, A877, they have abandoned that argument. With good reason. There is no evidence that Acacia told Rutherford not to work on Schlumberger-related matters or made any effort whatsoever to "effectively screen" her from such matters. *Columbia Valley*, 320 S.W.2d at 825. To the contrary, the documentary evidence that Appellants were compelled to produce (after nearly two months of resistance) conclusively refuted any such "screen," *see* A3530-31; A3551-52; A3592-93; A3595; A3602-03; A3607; A3613-14; A3632; A3848; A3258, A3262 (log nos. 10, 32-33); A3648 (log nos. 1-4); A3669-76 (log nos. 5, 13-15, 36-37, 40-41), and Appellants now concede that Rutherford "concur[ed] in the recommendation" to "acquire and enforce the '319 patent" against Schlumberger and others. D3D Br. 37.

Acacia's failure to screen Rutherford is particularly egregious given Acacia's admission that, before hiring Rutherford, Acacia had already identified the '319 patent as a potential purchase target and Schlumberger as a potential

defendant.   Acacia Br. 10.   Acacia therefore knew or should have known of the

potential ethical conflict—and the risk that Rutherford would disclose confidential

information—from the outset; yet, Acacia did not even attempt to screen her.

After "review[ing] the factual record before the court," including the

"evidence regarding Rutherford's involvement in the acquisition of the '319 patent

[and] the decision to sue Schlumberger," the district court did not "clearly err" in

finding that D3D "failed to rebut the presumption that Rutherford shared the

confidential information she acquired from Schlumberger with Acacia's legal

team." A11-12.  As discussed, Rutherford admitted to participating in at least two

meetings after she joined Acacia where Schlumberger and/or Petrel were discussed

and identified as a potential target for assertion of the patent—she did not excuse

herself from either meeting.  *Supra* at 8.   Rutherford testified that she approved

("concurred in") Acacia's decision to acquire the '319 patent and file suit against

Schlumberger.  *Supra* at 10.   Acacia's CEO had the benefit of Rutherford's

approval in authorizing D3D to bring patent infringement claims against

Schlumberger.  *Id*.  Rutherford engaged in all this conduct while privy to a massive

amount of attorney-client, trade-secret, and confidential information regarding

Schlumberger's Petrel product and the manner in which Schlumberger handles

intellectual property licensing and litigation.  *Supra* at 5-7.   On this record, the

district court did not abuse its discretion in disqualifying Acacia's in-house legal team; indeed the record compelled this result.

Other jurisdictions have found insufficient screening and disqualified firms in less egregious circumstances. For example, in *Apeldyn*, applying Third Circuit law, this Court held that the district court did not clearly err in disqualifying a firm in a patent infringement suit because the firm failed to "thoroughly vet" an attorney's potential conflicts "at the time he joined the firm," the firm only established an "informal screen of silence," and the attorney "continued to receive documents and emails relating to the case." 391 F. App'x at 874-76; *see also*, *e.g.*, *EZ Paintr Corp. v. Padco, Inc.*, 746 F.2d 1459, 1462-63 (Fed. Cir. 1984); *LaSalle Nat'l Bank v. Cty. of Lake*, 703 F.2d 252, 257-58 (7th Cir. 1983). The facts here are more compelling: there is no evidence that Acacia vetted Rutherford's potential conflicts or instituted even an "informal screen." Rutherford not only "continued to receive communications," she played an active role in Acacia's decision to acquire the '319 patent and sue Schlumberger.

Appellants argue that the district court erred because there was "uncontroverted evidence that no [confidential Schlumberger] information was disclosed" to Acacia's other in-house counsel. D3D Br. 34; *see also* Acacia Br. 52-53. Putting aside the claim's falsity, *see infra* at 42-45, that is not the test. As the Texas Supreme Court explained, "[t]he test for disqualification is met by

demonstrating a genuine *threat* of disclosure, not an actual materialized disclosure," because "focusing on actual disclosure would place a virtually insurmountable burden on the party seeking disqualification, since the only persons who know whether confidences were actually shared will generally be the very lawyers seeking to avoid disqualification." *Grant v. Thirteenth Court of Appeals*, 888 S.W.2d 466, 467 (Tex. 1994).[15]

In *Grant*, the court held that the presumption had not been rebutted even though "members of the [non-attorney's new] firm testified that no confidences had actually been revealed, and the [party opposing disqualification] presented no evidence to the contrary." *Id.* The court held that the new firm must be disqualified even though the migrating employee (a legal secretary) was terminated after three weeks and only performed clerical work "such as typing, filing, and scheduling" because "even the duties described—when carried out over a period of weeks—posed an unacceptable danger of a prohibited disclosure." *Id.* at 468.

In *In re American Home Products Corp.*, 985 S.W.2d 68, 75 (Tex. 1998), the court held that, even though there is "unequivocal[]" and "uncontroverted testimony from lawyers" that someone at the firm who previously did legal work for an adversary "did not reveal anything" to the new firm, that was not enough to

---

[15] The analysis in this section assumes, *arguendo*, that a *rebuttable* presumption applies, even though in Texas only *non*-attorneys get that benefit. *Supra* at 37-38.

rebut the presumption that the person revealed the former client's confidences to her new firm. The court reiterated that "the presumption may be rebutted *only* by establishing that 'sufficient precautions have been taken to guard against any disclosure of confidences.'" *Id.*

Here, as in *Grant* and *American Home Products*, Rutherford's new firm (Acacia's in-house legal department) failed to rebut any presumption of disclosure—Acacia did not attempt to screen, much less effectively screen, Rutherford from substantially related matters. As in those cases, it is irrelevant whether Rutherford in fact shared Schlumberger's client confidences because Rutherford's activities at Acacia "posed an unacceptable danger of a prohibited disclosure." *Grant*, 888 S.W.2d at 468. Thus, even if the more lenient (rebuttable) presumption applied here, the record strongly supports the district court's holding that it was not rebutted.[16]

### 3. Even If There Were *No* Presumption, The District Court Properly Found Rutherford Shared Confidences With Other Acacia In-House Counsel

Even if the law actually required Schlumberger to show that Rutherford shared confidences with Acacia, the district court properly found that Schlumberger made that showing. The district court determined that Rutherford

---

[16]  For the same reason, Appellants' argument (Acacia Br. 54-57) that the district court erroneously shifted to Acacia the burden of persuasion misses the mark. *See also infra* at 52-54.

*did* "provide[] confidential or proprietary information of Schlumberger or … its products and technology, including Petrel, to … Acacia or its affiliates." A11. The district court pointed to—and explained in detail—"Rutherford's involvement in the acquisition of the '319 patent, the decision to sue Schlumberger, and the hiring of Collins Edmonds." A11-12. That finding is well-supported and not clearly erroneous.

Rutherford's (1) concurrence in the decision to obtain the '319 patent and sue Schlumberger, (2) review and approval of a complaint that alleged willful infringement, and (3) participation in parallel '319 patent cases even after the disqualification motion was filed all constituted an unequivocal (if implicit) communication by her to Acacia that Acacia's claims (including Acacia's willfulness allegations) had merit and that Schlumberger's defenses (including its prior-art invalidity allegations) had no merit. As Professor Burton explained, under the Texas Disciplinary Rules of Professional Conduct, "confidential information" is an "extremely broad" term that includes "all information relating to a client or furnished by the client" during the course of the representation, A1200 (quoting Tex. Disciplinary Rules Prof'l Conduct 1.05(a)), and "confirming and agreeing with suing Schlumberger … is an implicit conveyance of confidential information," A1360 (128:5-14) (Burton). Given Rutherford's "extensive knowledge of the intellectual property of Schlumberger," that recommendation

"carrie[d] enormous weight compared to someone who has no access to that information."  A1364 (166:3-15) (Burton); *see also* A1365 (167:6-11).

In other contexts, courts have routinely recognized that expressing an opinion or taking an action implies that the speaker or actor is privy to information and facts justifying it.  For example, in the context of insider trading, a company insider's "wink and a nod" can constitute unlawful tipping as it can convey the insider's belief that it was a good time to sell stock.  *SEC v. Rocklage*, 470 F.3d 1, 4 (1st Cir. 2006).  Similarly, "'[a] statement of opinion as to facts not disclosed and not otherwise known to the recipient may' in some circumstances reasonably 'be interpreted by him as an implied statement' that the speaker 'knows facts sufficient to justify him in forming' the opinion, or that he at least knows no facts 'incompatible with [the] opinion.'"  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1330 (2015) (citation omitted).  And, "[a]rguably, any time a professional engages in a particular professional practice she is implicitly communicating the viewpoint that such practice is effective and beneficial."  *King v. Governor of N.J.*, 767 F.3d 216, 237 (3d Cir. 2014); *see also* Restatement (Third) of Law Governing Lawyers § 60 cmt. c(ii) (improper disclosure of client information can occur "either expressly or through a reasonably ascertainable inference"); Model Rules Prof'l Conduct r. 1.6(a) & cmt. 4 (ABA 2014) (prohibition on disclosure also includes those that "do not in

themselves reveal protected information but could reasonably lead to the discovery of such information").

The same is true here:  by "concurring" in the course of action against her former client, Schlumberger, Rutherford unmistakably communicated to Acacia that she "k[new] facts"—Schlumberger confidences—that justified or were not incompatible with those actions, *see Omnicare*, 135 S. Ct. at 1330, and that she believed such action would be "effective and beneficial."  *King*, 767 F.3d at 237. Her opinion that it was a good idea to sue Schlumberger—conveyed to Acacia with far more conviction and clarity than a "wink and a nod"—was informed by her inside knowledge.  Her statements and actions necessarily imparted that knowledge to Acacia.  *See Rocklage*, 470 F.3d at 4.  The record strongly supports the district court's finding that Rutherford shared Schlumberger's confidences with Acacia.

### 4.    Equitable Factors Strongly Favor Disqualification

Appellants incorrectly argue that the Fifth Circuit *requires* "a balancing analysis to determine whether the other lawyers at a disqualified lawyer's new firm should also be disqualified."  D3D Br. 38; *see id*. at 38-44; Acacia Br. 37-40.  The Fifth Circuit does not require a balancing approach.  Under Fifth Circuit and Texas law, if a migrating attorney personally represented a former client, all other attorneys at the attorney's new firm are conclusively disqualified by imputation. *Supra* at 32-37.  Even giving Acacia the benefit of a rebuttable presumption, the

standard for disqualification turns on adequate screening (absent here), not on balancing. *Supra* at 37-42.

Appellants' reliance on *DataTreasury* is misplaced. *See* D3D Br. 39, 41; Acacia Br. 37. In that case, the mandamus petitioner argued that, under *American Airlines*, the substantial relationship test requires "'categorical'" disqualification and the district court erred in considering equitable factors in refusing to disqualify a firm. *In re DataTreasury Corp.*, 2010 WL 3074395, at *2 (Fed. Cir. Aug. 5, 2010) (quoting *American Airlines*, 972 F.2d at 614). This Court recognized that *American Airlines* "lends support for [the petitioner's] position, but not enough to meet its burden for this extraordinary [mandamus] remedy" because the facts or law could rationally support the district court's decision to not disqualify the firm. *Id.* at *2-3. *DataTreasury* does not support *requiring* a balancing approach, particularly outside the mandamus context.

Regardless, the equitable factors strongly favor disqualification because the prejudice to Schlumberger far outweighs any purported harm to Appellants. Rutherford's confidences and knowledge gained at Schlumberger necessarily informed—and tainted—her concurrence in Acacia's decision to acquire the '319 patent and to sue Schlumberger based on the Petrel product. *Supra* at 5-11. That "concurrence" unmistakably communicated to her new Acacia colleagues and outside counsel that she thought the suit (including the willfulness allegations that

46

directly implicated her own conduct and state of mind at Schlumberger) had merit. Rutherford's approval of this suit is, therefore, highly prejudicial to Schlumberger.

In contrast, the harm claimed by Appellants is minimal, and entirely of their own making. District courts considering equitable factors have assessed the potential harm arising from the loss of chosen counsel (and the client's wasted time and money) primarily based on the stage of the litigation (including whether discovery was completed) and the timing of the disqualification motion. *See*, *e.g.*, *DataTreasury*, 2010 WL 3074395, at *3 (disqualification sought four years into litigation); *Nat'l Oilwell Varco, L.P. v. Omron Oilfield & Marine, Inc.*, 60 F. Supp. 3d 751, 771 (W.D. Tex. 2014) (disqualification sought after years of "laborious litigation" when "essentially all that remains" was trial). Here, unlike in *DataTreasury* and *National Oilwell*, Schlumberger raised the disqualification issue only two months into the litigation and filed its disqualification motion a few months after that—before discovery had begun.[17] As the district court expressly ruled, the potential conflicts were "raised at an extremely early stage in this case." A3383-84 (6:22-23, 7:3-6). D3D's (mis)representation to the district court that Rutherford was the subject of an effective screen only encouraged the court to

---

[17]  The delay from April to August 2014 is entirely attributable to D3D. D3D opposed lifting a pre-existing stay to permit Schlumberger to file its disqualification motion. A648; A686 (36:14-19). Schlumberger filed its motion just three days after the stay was lifted.

delay consideration of her conflict. Appellants are in no position to complain about the timing of their disqualification.

Acacia admits that it had identified the '319 patent as a target for potential acquisition, and Schlumberger as a target of a potential patent infringement suit, by the time it interviewed and hired Rutherford. Acacia Br. 10 (citing A1334 ¶ 28; A1294). Nonetheless, Acacia did nothing to screen Rutherford from Acacia's decision to acquire the '319 patent and sue Schlumberger. Further, Rutherford continued to work with Fischman on the five co-pending '319 patent actions involving the same issue of patent validity—including the issue whether Petrel was prior art that invalidates the '319 patent. *See* A821 (19:4-18); A822-23 (21:1-22:3); A2185 (¶ 8); A1861-932, A1934-2002, A2005-73. That Appellants chose to disregard the early-identified conflict and press forward, without any attempt to cure or use different personnel, is indefensible. Any prejudice Acacia suffered from the district court's order is a problem of its own making.

Acacia argues that the disqualification order "prohibits [Fischman's] replacement by another … licensing executive." Acacia Br. 39. However, the order disqualifies *counsel*, not executives. *See* A12 ("disqualify[ing] all inhouse *counsel* for Acacia and its subsidiaries" (emphasis added)). While non-attorneys can also be subject to disqualification in the Fifth Circuit, that issue is beyond the scope of Schlumberger's disqualification motion, the district court's order, or this

appeal. Although Acacia speculates that Schlumberger might move to disqualify future counsel, Acacia has done nothing since the motion to try to cure the problem, nor proposed some restructuring that may be acceptable to Schlumberger.

Acacia argues that under the district court's order Acacia and its subsidiaries are "barred, or seriously impaired, from enforcing" their property rights against Schlumberger (the property rights they purchased for the purpose of suing Schlumberger). Acacia Br. 39. Acacia argues, "Schlumberger has effectively won an injunction against Acacia and its subsidiaries from suing it for infringement of the '319 Patent." Acacia Br. 40. But the district court's order is *without prejudice*—Acacia has not been deprived of any property right.

### 5. Appellants Again Improperly Ask This Court To Make Factual Findings And Substitute Its Findings For Those Of The District Court

The rest of Appellants' arguments with respect to Acacia's in-house counsel amount to asking this Court to reweigh the evidence and to discard the district court's credibility determinations (including the district court's decision to credit *Appellants' own witness*, Rutherford). D3D Br. 33-38; Acacia Br. 57-66. That is improper.

First, for example, Appellants argue that "[t]his Court should examine the evidentiary record *de novo*" because the district court purportedly failed to sufficiently explain its ruling and ignored parts of the record. Acacia Br. 57; *see*

*id.* at 32-33.  Putting aside the fact that the district court *did* explain its ruling and the conclusions of fact that underlie it, factual findings are reviewed only for clear error and the district court is not required to "slavish[ly] trac[e]" the evidence. *Schlesinger*, 2 F.3d at 139; *see also* Fed. R. Civ. P. 52(a)(3) ("The court is not required to state findings or conclusions when ruling on a motion … unless these rules provide otherwise …."). This Court must "construe the [district] court's findings liberally and find them 'to be in consonance with the judgment, so long as that judgment is supported by evidence in the record.'" *Colonial Penn Ins.*, 157 F.3d at 1037. The district court gave ample explanation for its factual findings. A3-5, A9-12. "[A]ppellants list their own version of the facts and then complain that the district court … ignor[ed] these 'facts.'" *Schlesinger*, 2 F.3d at 139. But "[t]he district court did not ignore facts. It simply found facts contrary to the appellants' liking." *Id.*[18]

Second, Appellants repeatedly misrepresent the evidentiary record and Rutherford's role in approving the acquisition and enforcement of the '319 patent.

---

[18]  Unlike cases that Appellants cite (Acacia Br. 32-33, 57), the district court did not "reach[] conclusions having 'made no underlying findings of fact.'" *Id.* at 57 (citations omitted). Acacia's reliance on *ACS Hospital Systems, Inc. v. Montefiore Hospital*, 732 F.2d 1572, 1578 (Fed. Cir. 1984) (cited at Acacia Br. 33), is particularly misplaced. There, the Court did *not* undertake *de novo* review of the district court's infringement findings; it instead "dr[e]w from the facts found those inferences that are necessary to support the [district court's] ultimate finding." *Id.*

For example, Appellants argue that "Rutherford's only recommendation with respect to pursuing litigation was to proceed with a suit against *Halliburton*, not Schlumberger," and that "[t]he complaint against Schlumberger was filed without any input or feedback from Ms. Rutherford." D3D Br. 14. Similarly, Appellants contend that "Rutherford had done nothing more than state her non-objection to the suit being filed," Acacia Br. 18, and that this is the only evidence "that Rutherford 'concurred' in the lawsuit," Acacia Br. 17; *see also id*. at 24, 65.

Rutherford, however, expressly testified that she "concurre[d] with the recommendation from outside counsel and in-house counsel to acquire the 319 Patent and to sue Schlumberger." A826 (31:11-18); *see also* A825 (27:2-4); *supra* at 10, 23 n.7. Those are *her* words, under oath. In addition, as documented in emails produced on the eve of the disqualification hearing, Rutherford indicated that she did not object to suing Schlumberger and provided approving feedback on the complaint against Schlumberger (before and after it was filed). *Supra* at 11. Rutherford was Appellants' own witness and her testimony and writings (emails) refute Appellants' *post hoc* attempt to rewrite the evidence to minimize her role.

Third, Appellants urge this Court to reject Rutherford's account; they instead point to written declarations from Fischman, Vella, and Collins to argue that Rutherford had no role in approving the acquisition of the '319 patent and its assertion against Schlumberger, and that Rutherford did not convey any

confidential information.  D3D Br. 35-37, 54-56; Acacia Br. 21-25, 30, 55-61, 66. Appellants argue that Schlumberger had the "task … to dispute the factual record created by Vella and Fischman's sworn statements" and that the district court improperly imposed a burden of persuasion on Appellants.  Acacia Br. 55-56 (internal quotation marks and brackets omitted).

Appellants are wrong.  To rebut the presumption of shared confidences (assuming, *arguendo*, that it is rebuttable), Appellants needed to introduce evidence "which, *if believed by the trier of fact*, would support a [contrary] finding." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993); *see also, e.g.*, *Wanlass v. Gen. Elec. Co.*, 148 F.3d 1334, 1337 (Fed. Cir. 1998).  The district court was not obligated to credit Appellants' evidence.  *See*, *e.g.*, *Carlisle v. M/S Sistina*, 407 F.2d 824, 826 (5th Cir. 1969) ("That [the judge] chose to give no weight to such testimony is [his] prerogative."); *Breland v. United States*, 323 F.2d 492, 496 (5th Cir. 1963) ("The mere fact that a witness makes a statement … does not require an acceptance of such a statement as creditable evidence.").

Here, the district court credited Rutherford's oral testimony about her concurrence in the decision to acquire the '319 patent and sue Schlumberger, as well as Fischman's, Vella's, and Collins' involvement therein, with good reason—

it was an admission against her and her employer's interest.[19] The district court reasonably viewed that as a disclosure of Schlumberger's confidences. *Supra* at 42-45. The district court also had good reason to discount the self-serving declarations from Fischman, Vella, and Collins. Those declarations do not dispute that Rutherford concurred in obtaining the patent and suing Schlumberger, nor do they define what they mean by "confidential" information. *See* A3373-76; A1438-45.[20]

Appellants' argument that this Court should reject the testimony of their own witness (Rutherford), reweigh the evidence, and reach a different credibility determination is precisely what well-established precedent forbids. This Court cannot "undertake[] to duplicate the role of the lower court," *Anderson*, 470 U.S. at 573, and when the district court's factual finding is based on "credit[ing] the testimony of one witness over that of another," it is "'virtually never … clear error,'" *Schlesinger*, 2 F.3d at 139. Because "the district court's account of the

---

[19] Rutherford repeatedly reaffirmed that deposition testimony and Collins, who was present at both of her depositions, did not question its accuracy; only months later did he claim Rutherford "misremembered." A749 (30:3-4); A824 (23:15-18).

[20] Nor do those declarations speak to Rutherford's many contacts with *other* Acacia in-house counsel, such as John Schneider and Tisha Stender. *See* A771-72 (82:18-83:1); A3530; A3257-59 (log nos. 1-3, 9-13); A3262 (log no. 30).

evidence is plausible in light of the record viewed in its entirety," this Court cannot disturb its findings.  *Anderson*, 470 U.S. at 573-74.[21]

The district court correctly assessed Rutherford's role and disqualified all other Acacia other in-house counsel.

## C.    The District Court Did Not Abuse Its Discretion In Disqualifying Outside Counsel

The district court did not abuse its discretion in disqualifying D3D's outside counsel, Collins Edmonds, for two independent reasons.  First, the district court correctly held that, because of the contacts and communication among Rutherford, Fischman, and Collins Edmonds, there was a rebuttable presumption that Schlumberger's confidences had been shared with outside counsel, Collins Edmonds.  A13-14.  The record strongly supports the district court's conclusion that the presumption was not rebutted.  Second, even if there were no presumption, the record supports the district court's finding that Rutherford did, in fact, share Schlumberger's confidences.

---

[21]    *National Oilwell* and *ProEducation* (cited at Acacia Br. 55) are not to the contrary.  In *National Oilwell*, the district court rejected disqualification where, unlike here, it was presented with uniform testimony from *all* attorneys at the firm targeted with disqualification.  60 F. Supp. 3d at 767.  In *ProEducation*, the court declined to apply an irrebuttable presumption because, unlike here, the migrating attorney "was never involved with the [prior] representation."  587 F.3d at 304 n.7.  Neither case ever suggests that this Court should reweigh evidence.

1.    **The District Court Properly Found That Appellants Failed To Rebut The Presumption That Rutherford Or Other In-House Counsel Shared Confidences With Outside Counsel**

A rebuttable presumption arose that Rutherford's co-counsel, Collins Edmonds, is privy to Schlumberger's confidences and should also be disqualified for two separate reasons:  Collins Edmonds had sufficient interaction both with (1) Rutherford (who was directly disqualified) and (2) other Acacia in-house counsel (*e.g.*, Fischman and Vella, who are disqualified by imputation).

First, because Rutherford and Collins Edmonds "worked so closely together or the nature of their communications was such that there is a substantial likelihood that confidential information was shared," there is a rebuttable presumption of disclosure:  "the burden shift[ed] to [D3D] to offer evidence that there was no reasonable prospect that [Schlumberger's] confidential information was disclosed and that it was not in fact disclosed." *American Home Prods.*, 985 S.W.2d at 77-78.  The district court found sufficient communications and contacts between Rutherford and Collins Edmonds and that, "based on the factual record before the court," D3D failed to rebut the presumption that Collins Edmonds received Schlumberger's confidential information.  A13.  The record overwhelmingly supports those findings.  As the court explained, "[t]he court's review of the facts reveal[s] that multiple communications and conversations occurred between Rutherford, Fischman, and other inhouse Acacia attorneys and Michael Collins of

Collins Edmonds during the preparation to file suit against Schlumberger and other energy companies." A13-14.

Second, alternatively, because "there were substantive conversations between [Acacia in-house counsel, such as Fischman or Vella] and [Collins Edmonds], joint preparation for trial by those counsel, or the apparent receipt by [Collins Edmonds] of confidential information," there is a "presumption … that [those Acacia in-house counsel] shared confidential information with [Collins Edmonds]," which can be rebutted only by "probative and material evidence that the tainted [Acacia in-house counsel] … did not disclose confidential information of his adversary."  985 S.W.2d at 81; *see also In re CMH Homes, Inc.*, 2013 WL 2446724, at *5 (Tex. Ct. App. June 5, 2014) (applying presumption of shared knowledge in disqualifying co-counsel).  The district court properly determined that "Fischman, who reports to Rutherford and is as a result also disqualified, continues to actively work with Collins Edmonds in prosecuting the suit against Schlumberger" and that D3D and Acacia failed to rebut the resulting presumption that Fischman disclosed Schlumberger confidences to Collins Edmonds.  A14; *see also* A781 (102:16-20); A782-83 (103:20-104:4); *supra* 53 n.20.

Appellants argue that the district court should not have applied a presumption of disclosure.  D3D Br. 45-46.  Appellants contend that, under older Fifth Circuit precedent, *Brennan's, Inc. v. Brennan's Restaurants, Inc.*, 590 F.2d

168, 174 (5th Cir. 1979), and *Wilson P. Abraham Construction Corp. v. Armco Steel Corp.*, 559 F.2d 250, 253 (5th Cir. 1977), disqualification of co-counsel "is warranted only when *actual disclosure of the former client's confidential information* to co-counsel is shown." D3D Br. 45. As discussed, however, the Fifth Circuit draws heavily on Texas law. *See ProEducation*, 587 F.3d at 299; *American Airlines*, 972 F.2d at 614. Under the current version of the Texas Disciplinary Rules of Professional Conduct passed in 1990, as applied by the Texas Supreme Court, a rebuttable presumption of disclosure to co-counsel arises if there are sufficient contacts between Collins Edmonds and either Rutherford or Fischman. *See*, *e.g.*, *American Home Prods.*, 985 S.W.2d at 81.[22] That presumption was properly applied here.

### 2. Even If There Were In Fact *No* Presumption, The District Court Properly Found That Rutherford Shared Confidences With Outside Counsel

Even if the law required actual, not just presumed, disclosure (it does not), the district court correctly found that Schlumberger met that higher burden by offering sufficient "proof that Rutherford has communicated Schlumberger's confidential information to Collins Edmonds." A13-14. *See American Home*

---

[22] *Ledwig v. Cuprum S.A.*, 2004 WL 573650, at *3 (W.D. Tex. Jan. 28, 2004), and *Vinewood Capital, LLC v. Sheppard Mullin Richter & Hampton, LLP*, 735 F. Supp. 2d 503, 524 (N.D. Tex. 2010) (cited at D3D Br. 45), both acknowledge being guided by Texas law.

*Prods.*, 985 S.W.2d at 77 ("[D]isqualification will always be required when confidential information relating to the representation of an adverse client has been disclosed.").

At a minimum, Rutherford implicitly conveyed confidential Schlumberger information to Collins Edmonds just as she did to Acacia's in-house counsel. *Supra* at 42-45. Rutherford communicated to outside counsel that she concurred in the recommendations that Acacia acquire the '319 patent and file suit against her former client. *See, e.g.*, A827 (35:7-23). In view of the confidential information that Rutherford possessed about Schlumberger's intellectual property, including the Petrel product, that communication was an implicit communication of confidential and privileged information. *See Omnicare*, 135 S. Ct. at 1330; *King*, 767 F.3d at 237; *Rocklage*, 470 F.3d at 4. An attorney such as Collins who received or knew about Rutherford's recommendations could reasonably believe that, if someone with Rutherford's experience who until very recently served as Schlumberger's Deputy General Counsel for Intellectual Property would recommend that Acacia sue Schlumberger for willful patent infringement, then that claim likely has merit and could lead to the discovery of information adverse to Schlumberger.

As Professor Burton explained, given Rutherford's knowledge of Schlumberger's confidential and privileged information, Rutherford's

"communication to Mr. Collins … that she concurred in the recommendation" to acquire the '319 patent and sue Schlumberger "carried more weight than a typical recommendation" and was "an implied communication of confidential information." A1201 (¶ 43e); *see also* A1363 (149:8-23).

Appellants argue that Collins did not have any contact with Rutherford. D3D Br. 49. According to Appellants, "Rutherford's testimony is simply incorrect in this regard." *Id.* But the district court credited Rutherford's testimony that she *did* have such contact. *See supra* at 57, 10. Appellants again (improperly) urge this Court to substitute its own factual determinations for those of the district court and find the admissions against interest of Appellants' *own witness* (Rutherford) not credible. Appellants' argument is not only wrong but irrelevant because Collins undeniably communicated with Rutherford through Fischman. *See* A1198-99. For example, when Collins sent Fischman the draft complaint before it was filed, Fischman immediately forwarded it to Rutherford. Rutherford responded, "Good job. Please extend my thanks to [Collins Edmonds]." A3602-03. On this factual record, the district court correctly disqualified Collins Edmonds.

## III.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DISMISSING WITHOUT PREJUDICE

The district court expressly acknowledged that dismissal without prejudice was a "harsh result" but found that, because D3D's pleadings were drafted by lawyers privy to Schlumberger's confidential information, Schlumberger "will face

significant prejudice if [D3D] is permitted to continue to pursue its claims against Schlumberger in this case." A14.

Appellants state that "there is no case law or rule that requires or even supports dismissal." D3D Br. 56. Appellants are wrong and ignore cases cited below. For example, in *Doe v. A Corp.*, the Fifth Circuit held that the district court correctly disqualified an attorney from acting as class representative in a class action suit against his former employer and dismissed the action without prejudice. 709 F.2d 1043, 1050-51 (5th Cir. 1983). Because the class action was substantially related to the attorney's former duties as in-house counsel for the defendant, the Fifth Circuit irrebuttably presumed that the attorney would "use his former clients' confidential information to their detriment in prosecuting the action." *Id.* at 1045. The Fifth Circuit affirmed the district court's dismissal and injunction preventing "[the former attorney] and co-counsel from communicating with other persons to induce them to file suit and from disclosing any confidential information [the former attorney] gained during his employment at the [defendant]." *Id.* at 1050-51.[23]

---

[23] Appellants' attempt to distinguish *Doe* because it disqualified an attorney from acting as a class representative in a class action. D3D Br. 56-57. But in that case Doe *admitted* that he could not act as the class' attorney and voluntarily withdrew from that role. 709 F.2d at 1045. The Fifth Circuit went even further, holding that he *also* could not act as class representative. *Id.* at 1047-48. The court only

Other courts have similarly dismissed without prejudice based on disqualification of counsel. *See United States ex rel. Fair Lab. Practices Assocs. v. Quest Diagnostics Inc.*, 2011 WL 1330542, at *14 (S.D.N.Y. Apr. 5, 2011), *aff'd sub nom. United States v. Quest Diagnostics Inc.*, 734 F.3d 154 (2d Cir. 2013); *Ackerman v. Nat'l Prop. Analysts, Inc.*, 887 F. Supp. 510, 517 (S.D.N.Y. 1993), *aff'd*, 60 F.3d 810 (2d Cir. 1995); *see also United States ex rel. Holmes v. Northrop Gruman Corp.*, 2015 WL 3504525 (W.D. La. June 3, 2015). The district court did not abuse its discretion in applying that remedy here.

## IV.    ACACIA'S BELATED DUE PROCESS ARGUMENT IS MERITLESS

Acacia contends for the first time (as its *lead* argument, no less) that it was denied due process before the district court entered its disqualification order. This argument is baseless.

"The essential requirements of due process … are notice and an opportunity to respond"—"either in person or in writing." *Stone v. FDIC*, 179 F.3d 1368, 1375-76 (Fed. Cir. 1999). "[A]n opportunity to be heard does not require an oral or evidentiary hearing on the issue"—the court is free to consider written arguments instead. *Pac. Harbor Capital v. Carnival Air Lines, Inc.*, 210 F.3d

---

permitted the attorney to pursue the suit brought in his *personal* capacity. In this case, the disqualified attorneys have no disclosed personal interest in the litigation.

1112, 1118 (9th Cir. 2000); *see also Baldwin Hardware Corp. v. Franksu Enter. Corp.*, 78 F.3d 550, 562 (Fed. Cir. 1996).

Acacia's due process argument fails because it had ample notice and opportunity to be heard in person. And Acacia did, in fact, respond in writing (the court considered all Acacia's submitted evidence). Regardless, because Acacia could have—but failed to—raise a due process challenge in the district court, it cannot ask this Court to address it in the first instance.

## A.    Acacia Had Notice

Acacia does not contend that it lacked notice of the disqualification dispute, nor could it. Appellants—ARC, ARG, and D3D—are in essence all the same company: ARC is a patent-assertion entity that wholly-owns ARG, which in turn wholly-owns the shell company D3D that is the plaintiff in this case. *Supra* at 4. This litigation is wholly controlled by in-house Acacia counsel (primarily Fischman), who personally participated in the court-ordered meet and confer prior to Schlumberger filing its disqualification motion. A201 (3:7-11); A617-19. On October 14, 2014, Fischman and Acacia filed a joint motion to quash that discusses this case's briefing schedule and attaches Schlumberger's disqualification motion. *In re Subpoenas*, No. A-14-CV-967-LY, ECF No. 1 at 2 (S.D. Tex. Oct. 14, 2014). Outside counsel for Fischman and Acacia (1) appeared before Magistrate Judge Lane in an effort to resist Schlumberger's document requests and (2) entered

appearances the night before the disqualification hearing.  A3085-86; A3347-50.

Acacia had ample notice regarding the potential disqualification.

### B.    Acacia Had An Opportunity To Be Heard In Person And In Fact Did Respond In Writing

Acacia had ample opportunity to be heard in person.  Acacia argues that, at the hearing, the "District Court … affirmatively blocked [Acacia]'s attempt to be heard."  Acacia Br. 34.  However, at the outset of the hearing, the district court asked anyone "who is going to participate in the presentation today" to announce their presence and state "who you represent."  A3380 (3:4-6).  Acacia's counsel failed to announce their presence in the courtroom or their desire to participate in the hearing.  Not until the end of the session, after each side had exhausted their agreed-upon, court-ordered 60 minutes (plus more), did Acacia's counsel ask to be heard.  A3466-67 (89:21-90:7); *see* A3082-84 (allotting 60 minutes to D3D).  Acacia had an opportunity to be heard, but relinquished it by failing to respond to the Court's request for appearances, by failing to coordinate its presentation with D3D's counsel (who sat with Acacia's lawyers at counsel's table), and by failing to reserve some of the time allotted to its wholly-owned subsidiary, D3D.

Acacia also had an opportunity to—and in fact did—respond in writing.  *See Pac. Harbor Capital*, 210 F.3d at 1118.  On the eve of the hearing, Acacia filed a submission making legal and factual arguments.  A3356-57 ("Notice of Authority and Declarations").  In its order, the district court expressly recognized that

Acacia's filing was "[b]efore the court."  A2 (citing "Non-Parties Gary Fischman and Acacia Research Group, LLC's Notice of Authority and Declarations filed November 19, 2014").  The court addressed Acacia's legal argument that the presumption of shared confidences is rebuttable.  A7-8.  The court repeatedly stated that it considered the entire "factual record before the court" in making its decision, including the declarations of Vella and Fischman, both of which were attached to Acacia's submission.  *See* A10, A12-13.  Therefore, Acacia's arguments were considered and (for good reason) did not change the outcome.[24]

Further, after the hearing, Acacia could have submitted additional arguments it wished to make—including due process complaints—in a supplemental filing. *Cf.* A3470-77 (Schlumberger's post-hearing supplemental submission).  Having failed to take any such steps or raise a due process argument below, it cannot do so now.  *See Harding v. U.S. Naval Academy*, 567 F. App'x 920, 924 (Fed. Cir. 2014) (finding "no justification for excusing [appellant's] failure to preserve [the due process] issues below").  Acacia's due process argument fails.

---

[24] Appellants' assertion that Schlumberger unduly delayed filing of its supplemental evidentiary submission (Acacia Br. 18) is baseless: Appellants refused to produce that evidentiary material until ordered to do so by the Magistrate Judge, just days before the hearing.  A3051-55; A3040-44.

## CONCLUSION

For the foregoing reasons, the district court's judgment disqualifying counsel and dismissing the complaint without prejudice should be affirmed.

November 2, 2015                                            Respectfully submitted,


                                                           */s/ Maximilian A. Grant*

Terrence J. Connolly                                        Maximilian A. Grant
LATHAM & WATKINS LLP                                        Gabriel K. Bell
885 Third Avenue                                           Thomas J. Humphrey
New York, NY 10022                                         LATHAM & WATKINS LLP
(212) 906-1200                                             555 Eleventh St., NW, Suite 1000
                                                           Washington, DC 20004
Ann Marie Wahls                                            (202) 637-2200
LATHAM & WATKINS LLP
330 North Wabash Ave., Suite 2800
Chicago, IL 60611
(312) 876-7700


                                                           *Counsel for Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2015, I caused the foregoing Brief of Appellees to be filed with the Clerk of the United States Court of Appeals for the Federal Circuit using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

*/s/ Maximilian A. Grant*
Maximilian A. Grant

## CERTIFICATE OF COMPLIANCE WITH RULE 32

I hereby certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 13,994 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) because this brief was prepared using Microsoft Word 2010 in 14-point Times New Roman font.

*/s/ Maximilian A. Grant*
Maximilian A. Grant