2015-1628, -1629

---

# United States Court of Appeals
# for the Federal Circuit

DYNAMIC 3D GEOSOLUTIONS LLC,

*Plaintiff-Appellant,*

ACACIA RESEARCH CORPORATION, ACACIA RESEARCH GROUP LLC,

*Nonparties – Appellants,*

v.

SCHLUMBERGER LIMITED (SCHLUMBERGER N.V.), SCHLUMBERGER HOLDINGS CORPORATION, SCHLUMBERGER TECHNOLOGY CORPORATION,

*Defendants-Appellees.*

---

*Appeal from the United States District Court for the Western District of Texas in case no. 1:14-cv-00112-LY, Judge Lee Yeakel*

---

## OPENING BRIEF OF PLAINTIFF-APPELLANT

---

August 20, 2015

Michael J. Collins
John J. Edmonds
Shea N. Palavan
COLLINS, EDMONDS, POGORZELSKI,
SCHLATHER & TOWER, PLLC
1616 South Voss Road, Suite 125
Houston, Texas 77057
Telephone: (281) 501-3425
Facsimile: (832) 415-2535
Email: mcollins@cepiplaw.com
        jedmonds@cepiplaw.com
        spalavan@cepiplaw.com

*Attorney for Plaintiff-Appellant*
DYNAMIC 3D GEOSOLUTIONS LLC

## CERTIFICATE OF INTEREST

Pursuant to Federal Rule of Appellate Procedure 26.1 and Federal Circuit Rule 47.4, undersigned counsel for Plaintiff-Appellant hereby certifies that:

1.      The full names of every party or amicus represented by me is:

Dynamic 3D Geosolutions LLC

2.      The names of the real parties in interest (if the party named in the caption is not the real party in interest) represented by me is:

None

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Acacia Research Group LLC

4.      The names of all law firms and the partners or associates that appeared for any of the parties represented by me in the District Court or are expected to appear in this Court are:

Current Counsel:

COLLINS, EDMONDS, POGORZELSKI, SCHLATHER & TOWER, PLLC;
John J. Edmonds
Michael J. Collins
Henry Pogorzelski
Shea Palavan

Former counsel:

NELSON BUMGARDNER P.C.
Matthew C. Juren

FOMBY & ZARGHOUNI LLC;
Matthew Zarghouni

Dated: August 20, 2015

/s/ Michael J. Collins
Michael J. Collins

## TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................. I

TABLE OF CONTENTS......................................................................... III

TABLE OF AUTHORITIES .................................................................. VI

STATEMENT OF RELATED CASES ................................................. VIII

I.    STATEMENT OF JURISDICTION.................................................. 1

II.   STATEMENT OF THE ISSUES..................................................... 3

III.  STATEMENT OF THE CASE ......................................................... 6

IV.   STATEMENT OF THE FACTS ....................................................... 8
      A.   D3D's Patent Infringement Case Against Schlumberger ............ 8

      B.   Rutherford's Prior Work at Schlumberger.................................. 8

      C.   Ms. Rutherford's Limited Involvement With the Acquisition of the '319 Patent and the Enforcement of the '319 Patent Against Parties Other Than Schlumberger, and her Non-Involvement with Enforcement Against Schlumberger ............................................................................... 11

      D.   D3D Hires CEP as Litigation Counsel ..................................... 15

V.    SUMMARY OF THE ARGUMENT ............................................... 17

VI.   STANDARD OF REVIEW ............................................................. 19

VII.  ARGUMENT .................................................................................. 20
      A.   The District Court erred in holding that the subject matter of Rutherford's former representation of Schlumberger is substantially related to her alleged representation of D3D in this case. .................................................. 20
           1.   The District Court erred legally and factually by relying upon Schlumberger counsel's unsworn descriptions of the contents of documents allegedly showing what Ms. Rutherford worked on while at Schlumberger instead of reviewing the actual documents. Further, Schlumberger's unsworn

descriptions cannot provide a factual basis for affirming the District Court's finding that the substantially related test was satisfied. ...................................20

2.     The District Court committed error legally and factually by failing to engage in a painstaking analysis of the facts and precise application of precedent before making an unwarranted finding a "substantial relationship" between Rutherford's work at Schlumberger and this case. ...........................................23

3.     The District Court erred by disregarding or failing to give proper weight to evidence demonstrating that the relationship between Ms. Rutherford's former representation of Schlumberger and this case was tangential at best. ..24

4.     The District Court erred by disregarding Ms. Rutherford's limited role as a supervisory in-house counsel when applying the substantial relationship test.
31

B.   The District Court erred in disqualifying Mr. Fischman and all in-house attorneys employed by Acacia and each of its subsidiaries from representing D3D in this case. .....................................................................................................33
1.     The District Court's finding that D3D failed to rebut any presumption that Ms. Rutherford shared confidential information of Schlumberger with Mr. Fischman and other in-house attorneys at Acacia was clearly erroneous, including in light of uncontroverted evidence that no such information was disclosed. .........................................................................................................33

2.     The District Court committed legal error by failing to weigh the harm that D3D would suffer as a result of disqualifying Mr. Fischman and every attorney-employee of Acacia against any possible harm to Schlumberger from allowing those lawyers to continue to represent D3D. ...................................................38

C.   The District Court Erred in disqualifying all attorneys employed by D3D's outside litigation counsel from representing Appellant in this case. ..................44
1.     The District Court committed legal error by ignoring Fifth Circuit precedent and improperly imputing the alleged conflict of Rutherford to CEP.
44

2.     There is no evidence in the record that Ms. Rutherford communicated any alleged confidential information of Schlumberger to Collins, Edmonds and the District Court's findings to the contrary are clearly erroneous. .......................48

3.    The District Court's finding that D3D failed to rebut an alleged presumption that confidential information of Schlumberger was disclosed to Collins, Edmonds was clearly erroneous, including in light of uncontroverted rebuttal evidence establishing that no confidential information of Schlumberger was disclosed to Collins, Edmonds....................................................................53

D.    The District Court erred in dismissing all of D3D's claims and causes of action against Schlumberger, including in view of the lack of legal authority or other legal or factual justification for such draconian relief..............................56

VIII.    CONCLUSION AND PRAYER....................................................................59

VII.    CERTIFICATE OF SERVICE....................................................................61

VIII.    CERTIFICATE    OF    COMPLIANCE    WITH    TYPE-VOLUME LIMITATION,    TYPE-FACE    REQUIREMENTS,    AND    TYPE-STYLE REQUIREMENTS..........................................................................................62
ADDENDUM ...................................................................................................63

## TABLE OF AUTHORITIES

### Cases

*American Can Co. v. Citrus Feed Co.*, 436 F.2d 1125, 1129 (5th Cir. 1970)... 48, 51

*Arnold v. Cargill Inc.*, 2004 WL 2203410 (D. Minn. Sept. 24, 2004) .................... 59

*Biax Corp. v. Fujitsu Computer Sys. Corp.*, 2007 WL 1466638 (E.D. Tex. May 16, 2007) ................................................................................................................ 29

*Brennan's, Inc. v. Brennan's Restaurants, Inc.,* 590 F.2d 168 (5th Cir.1979)21, 25, 45, 46, 47, 48, 53

*Ciba-Geigy Corp. v. Alza Corp.*, 795 F. Supp. 711 (D.N.J. 1992) ......................... 29

*Cossette v. Country Style Donuts, Inc.,* 647 F.2d 526, 530 (5th Cir.1981) ............. 38

*Dieter v. Regents of Univ. of California,* 963 F.Supp. 908 (E.D. Cal. 1997) .......... 21

*Doe v. A Corp.*, 709 F.2d 1043 (5th Cir. 1983) ....................................................... 57

*Duncan v. Merrill, Lynch, Pierce, Fenner & Smith* ............................................... 24

*Duncan    v.    Merrill,    Lynch,    Pierce,    Fenner    &    Smith,* 646 F.2d 1020 (5th Cir. 1981) ................................................................................ 25

*Duncan v. Merrill, Lynch, Pierce, Fenner & Smith*, 646 F.2d 1020 (5th Cir. 1981) ............................................................................................................ 20, 22, 59

*FDIC v. United States Fire Ins. Co.*, 50 F.3d 1304 (5th Cir. 1995) .................. 20, 38

*Gibbs v. Paluk,* 742 F.2d 181, 185 (5th Cir.1984) .................................................. 38

*In re American Airlines, Inc.,* 972 F.2d 605 (5th Cir. 1992) ............... 20, 22, 24, 25

*In    re    American    Home    Products    Corp.,* 985 S.W.2d 68 (Tex. 1998) .................................................................... 46, 47, 53

*In re Corrugated Container*, 659 F.2d 1341, 1341 (5th Cir. 1981) .................. 44, 45

*In re Data Treasury Corp.*, Case No. 2010-M928, 2010 U.S. App. LEXIS 16631 (Fed. Cir. Aug. 5, 2010) ...................................................................... 19, 39, 41

*In re Datatreasury Corp.,* 2010 WL 3074395 (Fed. Cir. Aug. 5, 2010) ................ 21

*In re Drake*, 195 S.W.3d 232 (Tex. App.—San Antonio 2006, no pet.) ................ 28

*In re ProEducation Intern., Inc.*, 587 F.3d 296, 303-304 n. 7 (5th Cir. 2009)34, 44, 45

*In re Texas Windstorm Insurance Association*, 417 S.W.3d 119 (Tex.App—Houston [1st Dist.] 2013, no pet.) ...................................................................... 27

*Johnston v. Harris County Flood Control Dist.*, 869 F.2d 1565 (5th Cir. 1989) .... 22

*Kreeger v. State Farm Fire & Cas. Co.*, 2008 WL 1745197 (S.D. Miss. Apr. 11, 2008) ............................................................................................................ 59

*Ledwig v. Cuprum S.A.*, 2004 WL 573650 (W.D. Tex. Jan. 28, 2004) ...... 45, 47, 53

*McIntosh v. State Farm Fire & Cas. Co.*, 2008 WL 941640 (S.D. Miss. Apr. 4, 2008) ............................................................................................................ 59

*Metro. Life Ins. Co. v. Syntek Fin. Corp.*, 881 S.W.2d 319 (Tex. 1994) ................ 28

*National Oilwell Varco, L.P. v. Omron Oilfield & Marine, Inc.*, 2014 WL 6388402 at *9 (W.D. Tex. Nov. 14, 2014) .......................................... 34, 39, 40, 41, 43, 46

*NCNB Tex. Nat'l Bank v. Coker*, 765 S.W.2d 398 (Tex. 1989) ...............................................................22

*OneBeacon Ins. Co. v. T. Wade Welch & Associates*, 2012 WL 393309 (S.D.Tex. Feb. 6, 2012)................................................................... 22, 24

*Power MOSFET Techs., L.L.C. v. Siemens AG,* 2002 WL 32785219, No. 2:99–CV–168 (E.D. Tex.2002) (Folsom, J .).................................... 21, 24, 29, 30

*Silver Chrysler Plymouth Inc. v. Chrysler Motors Corp.,* 518 F.2d 751 (2nd Cir. 1975).....................................................................21

*Soverain Software LLC v. CDW Corp.*, 2010 WL 1038731 (E.D. Tex. March 18, 2010) ........................................................................ 21, 24

*United States v. Mann*, 161 F.3d 840 (5th Cir. 1998).............................................20

*Vinewood Capital, LLC v. Sheppard Mullin Richter & Hampton, LLP*, 735 F.Supp.2d 503 (N.D. Tex. 2010)......................................... 45, 47, 53

*Wilson P. Abraham Construction Corp. v. Armco Steel Corp.,* 559 F.2d 250 (5th Cir.1977).....................................................................45

*Woods v. Covington Cnty. Bank,* 537 F.2d 804, 812–13 (5th Cir. 1976) ................39

**Statutes**

Fed. R. App. P. 4 .....................................................................................................1

## STATEMENT OF RELATED CASES

Other than the related cases consolidated for this appeal, there have been no other appeals before this or any other appellate court stemming from the civil action giving rise to this appeal.

## I.   STATEMENT OF JURISDICTION

Plaintiff-Appellant, Dynamic 3D Geosolutions LLC ("D3D"), brings this Appeal from the United States District Court for the Western District of Texas (the "District Court") to the United States Court of Appeals for the Federal Circuit in accordance with 28 U.S.C. § 1295(a)(1). *See* Fed. R. App. P. 4(a)(4)(B)(i).

This is a case arising under the United States Patent Laws and jurisdiction exists in accordance with and pursuant to 28 U.S.C. §§ 1338(a) and 1400(b).  D3D is appealing the orders of the District Court entered on March 31, 2015 (1) disqualifying Charlotte Rutherford ("Rutherford") from representing D3D in the case; (2) disqualifying all in-house counsel for Acacia Research Corporation ("ARC") and its subsidiaries, including D3D, from representing D3D is this case; (3) disqualifying the law firm of Collins, Edmonds, Pogorzelski, Schlather & Tower, PLLC ("CEP") and all lawyers in the firm from representing D3D in the case; and (4) dismissing, without prejudice, all claims and causes of action asserted by D3D against Defendants-Appellees Schlumberger Limited, Schlumberger Holdings Corporation and Schlumberger Technology Corporation (collectively, "Appellees" or "Schlumberger")[1]. These orders are final orders because the dismissal fully disposes of all parties' claims.

---

[1] The District Court also entered final judgment on March 31, 2015, awarding Schlumberger costs of court and closing the case.

This Appeal has been timely taken within thirty (30) days of the aforementioned orders pursuant to 28 U.S.C. § 2107. The orders appealed from were entered on March 31, 2015 and the notice of appeal was filed on April 23, 2015.

## II.    STATEMENT OF THE ISSUES

1. Whether the District Court erred in finding that the subject matter of Rutherford's former representation of Schlumberger is substantially related to her alleged representation of D3D in this case.

2. Whether the District Court erred by relying upon Schlumberger counsel's unsworn descriptions of the contents of documents allegedly showing what Ms. Rutherford worked on while at Schlumberger instead of reviewing the actual documents; and/or whether such unsworn descriptions can provide a factual basis for the District Court's finding that the substantially related test was satisfied.

3. Whether the District Court erred by failing to engage in a painstaking analysis of the facts and precise application of precedent before finding a "substantial relationship" between Rutherford's work at Schlumberger and this case.

4. Whether the District Court erred by disregarding or failing to give proper weight to evidence demonstrating that the relationship between Ms. Rutherford's former representation of Schlumberger and this case was tangential at best.

5. Whether the District Court erred by disregarding Ms. Rutherford's role as a supervisory in-house counsel when applying the substantial relationship test.

6. Whether the District Court erred in disqualifying Mr. Fischman and all in-

house attorneys employed by Acacia and each of its subsidiaries from representing D3D in this case.

7. Whether the District Court's findings that D3D failed to rebut any presumption that Ms. Rutherford shared confidential information of Schlumberger with Mr. Fischman and/or other in-house attorneys at Acacia was clearly erroneous, including in light of uncontroverted evidence that no such information was disclosed.

8. Whether the District Court erred by failing to balance the interests of the parties and/or ignored or failed to give proper weight to evidence showing that the harm that D3D would suffer as a result of disqualifying Mr. Fischman and every attorney-employee at Acacia greatly outweighed any possible harm to Schlumberger from allowing Acacia in-house lawyers to continue to represent D3D.

9. Whether the District Court Erred in disqualifying all attorneys employed by D3D's outside litigation counsel, CEP, from representing D3D in this case.

10. Whether the District Court erred by imputing the alleged conflict of Rutherford to CEP, including in violation or disregard of applicable Fifth Circuit precedents.

11. Whether the District Court's finding that Ms. Rutherford communicated alleged confidential information of Schlumberger to CEP is clearly erroneous,

including because there is no evidence in the record to support it.

12. Whether the District Court's finding that D3D failed to rebut a presumption that confidential information of Schlumberger was disclosed to CEP was clearly erroneous, including in light of uncontroverted evidence establishing that no confidential information of Schlumberger was disclosed to CEP.

13. Whether the District Court erred in dismissing all of D3D's claims and causes of action against Schlumberger, including in view of the lack of legal authority or other legal or factual justification for such draconian relief.

### III.    STATEMENT OF THE CASE

D3D filed suit against Schlumberger for infringing U.S. Patent No. 7,896,319 (the "'319 patent") on February 4, 2015. A93[2]. On August 15, 2014, Schlumberger filed a motion to disqualify counsel and to dismiss without prejudice. A701-1283. D3D filed its response in opposition to the motion on September 5, 2014. A1284-1552. On September 19, 2014, Schlumberger filed a reply brief in support of its motion. On November 19, 2014, less than 24 hours before the hearing on Appellees' motion, Schlumberger filed a "Supplemental Submission" and supporting evidence totaling 151 pages.  A3158 – A3309; *see also* A3824 – A3855). That evidence included emails and other documents produced by Rutherford, ARG, D3D, and Austin Geo. The District Court heard the matter on November 20, 2014. A3378-3469.  On March 31, 2015, the District Court entered its order (1) disqualifying Ms. Rutherford from representing D3D in the case; (2) disqualifying all in-house counsel for ARC and its subsidiaries, including D3D, from representing D3D is this case; (3) disqualifying CEP, and all lawyers in the firm, from representing D3D in the case; and (4) dismissing, without prejudice, all claims and causes of action asserted by D3D against Schlumberger. A2-15. Also on March 31, 2015, the District Court entered final judgment awarding Schlumberger costs of court and closing the case.

---

[2] On that same day, D3D also filed a suit alleging infringement of the '319 patent against Schlumberger's competitor, Halliburton. On June 4, 2014, D3D filed similar patent infringement suits against four additional competitors of Schlumberger.

A1. D3D timely appealed these orders and judgments on April 23, 2015.

# IV.    STATEMENT OF THE FACTS

## A. D3D's Patent Infringement Case Against Schlumberger

D3D is the owner by assignment of the '319 patent, which discloses and claims improved systems and methods for combining seismic and well log data into an interactive three-dimensional interpretation display which is dynamically generated by the software in real time. A98-99; A34-92. This case involves allegations by D3D that certain features of Schlumberger's Petrel geological and geophysical interpretation platform infringes the '319 patent. A99-100.

## B. Rutherford's Prior Work at Schlumberger

Charlotte Rutherford is a lawyer who formerly worked as an in-house intellectual property counsel at Schlumberger from July 2006 to May 2013. A786-787. Shortly after departing from Schlumberger, Ms. Rutherford began working at Acacia Research Group LLC ("ARG"). A806. D3D is a wholly-owned subsidiary of ARG which, in turn, is a wholly-owned subsidiary of ARC (ARC and ARG are hereinafter collectively referred to as "Acacia"). *See* Doc. No. 14-1.

Schlumberger's disqualification motion is premised on its theory that Ms. Rutherford's limited exposure to the Petrel product as a supervisory in-house counsel at Schlumberger is "substantially related" to what Schlumberger alleges is her later "representation" of D3D. Schlumberger's evidence of the Petrel-related matters that Ms. Rutherford was exposed to at Schlumberger comes largely from

what it describes as a "privilege-type" log that it attached to the Motion. *See* A845-859. The "log" contains unsworn descriptions of documents never produced to the District Court or D3D that, according to Schlumberger's counsel's unsworn arguments to the District Court, link Ms. Rutherford to Petrel. *Id.* Schlumberger did not submit any of these documents to the Court for *in camera* review or otherwise, and refused to furnish them, even with privileged information redacted, to D3D's counsel.[3] The author of the "privilege-type" log remains a mystery. To be clear, ***none*** of the documents that the log purports to characterize were put into evidence or otherwise provided to the District Court. Indeed, there is no evidence that they are what Schlumberger's lawyers characterized them to be. D3D timely objected to Schlumberger's attempt to use the "privilege-type" log as evidence. A1301.

Schlumberger claims that Ms. Rutherford was involved in two matters specifically related to "Petrel" during her tenure there. The first was what is known within Schlumberger as a "Goldstar" assessment to develop strategy for obtaining patent protection for Petrel vis-à-vis its competitors. A715. The second was managing outside counsel in a copyright infringement case in Canada brought by Schlumberger over the alleged unlicensed copying of an earlier version of Petrel.

---

[3] Amon Burton, Schlumberger's expert, relied upon these descriptions in rendering his opinions, but admits that he never *saw* the documents, or even knew who wrote the descriptions. Burton Depo., 13:14-17:13, JA A1350-1354. Professor Burton further admitted that Exhibit 3 is not a privilege log. *Id.*

A717.

However, Ms. Rutherford did not prepare any of the Goldstar projects or reports. Rutherford Depo., Vol. I, 162:18-20, A1406. She had no immediate supervisory responsibility for any of the Goldstar projects. *Id.* at 162:18-20; 163:15-19, A1406-07. Ms. Rutherford provided high-level instructions for employees who would actually perform the analysis, but those instructions were not unique to Petrel. *Id.* at 163:1-19, 165:7-166:3, JA 1407, 1408-09. Ms. Rutherford did not perform any substantive work on the report beyond providing the general instructions for creating a Goldstar presentation. *Id.* at 166:23-4, A1409; 167:18-21, A1410. The one Goldstar presentation that Ms. Rutherford recalls concerned Petrel only as it existed in 2007. *Id.* at 165:7-166:3, A1408-09. She also sat in, when she could fit it in her schedule, on a few Goldstar presentations, which were being provided to a broad audience of Schlumberger employees. Id. at 161:25-162:11, A1405-06.

Ms. Rutherford's role in the Canadian copyright litigation, along with Diane Ralston, another Schlumberger lawyer, was limited to managing outside counsel. Rutherford Depo., Vol. I, 124:18-24, A1403. That case involved only the illegal, verbatim copying of an older version of Petrel. *Id.* at 125:13-21, A1404*; see also* Rutherford Depo., Vol. II, 46:23-25, A1431.

There is no evidence that Ms. Rutherford performed any work related to the '319 patent or that she was even aware of the existence of the '319 patent while at

Schlumberger. There is no evidence that Ms. Rutherford ever participated in any patent litigation related to Petrel while at Schlumberger. There is no evidence that Ms. Rutherford was ever involved in any patent litigation at Schlumberger that presented legal and factual issues that were substantially similar to those presented in this case. There is no evidence that Ms. Rutherford performed, or was exposed to, any kind of analysis of whether Petrel infringed any patent, much less the '319 patent. There is no evidence that Ms. Rutherford performed, or was exposed to, any kind of freedom to operate analysis for any version of Petrel. There is no evidence in the record that Ms. Rutherford's knowledge of the technical features of Petrel even rose to the level of the information that Schlumberger advertises to the public about Petrel on its website.

## C. Ms. Rutherford's Limited Involvement With the Acquisition of the '319 Patent and the Enforcement of the '319 Patent Against Parties Other Than Schlumberger, and her Non-Involvement with Enforcement Against Schlumberger

After going to work for ARG, Ms. Rutherford did not discuss the patent infringement case against Schlumberger with anyone at Acacia. Rutherford Depo., Vol. I, 93:18-96:1, A1398-1401; 44:25-45:9, A1387-88. Likewise, Ms. Rutherford did not discuss Schlumberger's Petrel product with anyone at Acacia or D3D. *Id.*, 45:13-19, A1388.

The only communications that Ms. Rutherford had in connection with the evaluation and acquisition of the '319 patent were two meetings with the then owner

of the patent, Austin Geomodeling, Inc. ("AGM"), and a phone call in which she testified that a presentation was made recommending that ARG acquire the '319 patent. *Id.* at 88:16-22, A1397. The only people Ms. Rutherford has spoken to regarding the '319 Patent are people who attended these three meetings, and Marc Booth, the head of engineering at Acacia. *Id.* at 93:19-94:17, A1398-99. At both meetings with AGM, the inventors of the '319 patent brought up Schlumberger and mentioned that it had a product known as Petrel. Rutherford Depo., Vol. II, 42:14-25, A1428. However, when Schlumberger was mentioned, Ms. Rutherford told the participants at both meetings that she used to work for Schlumberger and would not talk about Schlumberger.    Rutherford Depo., Vol. I, 42:21-25, A1385; 44:5-9, A1387; and 44:25-45:9, A1387-88; Vol. II, 42:14-25, A1428. There was no further conversation about Schlumberger at either meeting. Rutherford Depo., Vol. II, 42:21-25, A1428; 44:5-9, A1429; and 44:25 – 45:9, A1429-30. Ms. Rutherford further testified that she could not recall any discussion in either of the AGM meetings about why the inventors of the '319 Patent believed Schlumberger might be a potential infringer. Rutherford Depo., Vol. I, 44:1-4, A1387.

After the two meetings with AGM, Ms. Rutherford participated in an internal Acacia telephone conference call during which the question of whether to finalize the acquisition of the '319 patent was discussed[4]. Rutherford Depo. Vol. I, 70:25-

---

[4] Ms. Rutherford testified from memory at her deposition in another case that the

72:9, A1389; Fischman Decl. Ex., ¶ 6, A1440. During that call, which occurred on November 7, 2013, Mr. Fischman of ARG made a PowerPoint presentation to Matt Vella, ARG's CEO. Fischman Decl. ¶¶ 4-5, A1439-40. Mr. Fischman recommended to Mr. Vella that ARG finalize the acquisition of the '319 patent and form a subsidiary to license and enforce it. *Id.* No outside counsel participated in the call. Fischman Decl. ¶ 7, A1440. Ms. Rutherford excused herself from the call before there was any discussion related to Schlumberger and did not rejoin. Fischman Decl. ¶ 6, A1440; Rutherford Depo., Vol. I, 72:10-19, A1389. Mr. Vella made the decision to finalize the acquisition of the '319 patent at the conclusion of the conference call and after Ms. Rutherford departed. Fischman Decl. ¶ 8, A1440.

On November 18, 2013, ARG transmitted a formal written notice to AGM of acceptable completion of the investigation period on the '319 patent, and ARG advised AGM that the pervious patent assignment agreement dated August 20, 2013 continued with full force and effect. *Id.,* ¶ 10.

---

conference call included outside counsel and the two named inventors of the '319 patent, and that outside counsel made a Power Point presentation recommending that Acacia acquire the '319 patent. Rutherford Dep. Vol. I, 70:25-72:9, JA A1389. However, her testimony regarding the identity of the participants in the conference call is contradicted by the other clear and unequivocal evidence in the record. Mr. Fischman's and Mr. Collins' sworn declarations both state that outside counsel did not make the Power Point presentation recommending acquisition of the '319 patent and did not participate in the meeting. Fischman Decl., ¶¶ 5 and 7, JA A1440; Collins Decl., ¶¶ 9-11, JA A1444-45. No Power Point presentation authored by Mr. Collins or any other outside counsel is found in the record.

Ms. Rutherford's involvement in the decision to acquire the '319 patent was limited to concurring in a recommendation made by other participants on the November 7, 2013 call. Rutherford Depo., Vol. I, 79:17-80:14, A1392-93; 86:9-87:6, A1395-96. Ms. Rutherford's only recommendation with respect to pursuing litigation was to proceed with a suit against *Halliburton*, not Schlumberger. *Id.* at 85:14-25, A1394; 87:19-22 JA 1396.

Ms. Rutherford was not involved in any due diligence related to the validity of the '319 Patent. *Id.* at 74:2-75:14, A1390-91; Rutherford Depo, Vol. II, 47:6-14, A1432. Ms. Rutherford was not involved in the negotiation or approval of the terms for acquisition of the '319 Patent. Rutherford Depo., Vol. II, 49:1-9, A1433. Ms. Rutherford has no knowledge regarding the financial arrangement of Acacia's acquisition of the '319 Patent. *Id.* at 49:10-13, A1433. There was no review by, or input from, Ms. Rutherford related to a pre-suit investigation or infringement analysis with respect to Schlumberger. Rutherford Depo., Vol. II, 17:9-11, A1423.

Ms. Rutherford spoke with Mr. Fischman about the protection of D3D's patent rights; however, these conversations related to *Halliburton* and not Schlumberger. *Id.* at 17:22-21:21, A1423. The complaint against Schlumberger was filed without any input or feedback from Ms. Rutherford. *Id.* at 16:4-12; 16:13-17, A1422. The only comment Ms. Rutherford made to anyone at Acacia, D3D, AGM, or CEP regarding the Schlumberger complaint was to thank Mr. Fischman for

sending her a courtesy copy. *Id.* at 17:1-8, JA A1423. Mr. Fischman is the only person at Acacia who interacted with outside counsel on any of the '319 Patent cases. Rutherford Depo., Vol. I, 102:16-25, JA A1402.

### D. D3D Hires CEP as Litigation Counsel

Mr. Fischman first approached Michael Collins of CEP about representing an Acacia subsidiary in the enforcement of the '319 patent on November 12, 2013 – five days *after* the telephone call in which Mr. Fischman made the PowerPoint presentation to Mr. Vella and the decision was made to finalize the acquisition of that patent. Fischman Decl.*,* ¶ 9, JA A1440; Collins Declaration, ¶ 3, JA A1443. Prior to November 12, 2013, neither Mr. Collins nor anyone at CEP had ever heard of the '319 patent or that ARG was contemplating forming a subsidiary for purposes of enforcing that patent. *Id*. Neither Mr. Collins nor anyone in his firm provided a recommendation to Rutherford or anyone else at Acacia as to whether Acacia should or should not acquire the '319 patent. *Id., ¶* 6, JA A1444.

When Mr. Collins first met Ms. Rutherford in June of 2013 on an unrelated matter, she stated to him that she would not discuss anything related to Schlumberger or its technology. *Id., ¶* 7. After that first meeting, neither Mr. Collins nor anyone at his firm had any discussion with Ms. Rutherford regarding Schlumberger or any of its products and technology, including with respect to Schlumberger's Petrel software. *Id., ¶* 7. While Mr. Collins had several discussions regarding the

enforcement of the '319 patent within groups of people at ARG that included Ms. Rutherford, neither he nor anyone at his firm had any discussion related to Schlumberger or Petrel in her presence. *Id.,* ¶ 8.

Mr. Collins testified that neither he nor anyone at CEP prepared and/or presented a PowerPoint presentation to anyone at ARG or any subsidiary thereof, including Ms. Rutherford, that made any recommendation regarding whether to acquire the '319 patent. *Id.,* ¶ 9. Mr. Collins further testified that neither he nor anyone at CEP prepared and/or presented a PowerPoint presentation to anyone at ARG, including Mr. Fischman, Ms. Rutherford, or Mr. Vella, that contained a recommendation as to whether to sue Schlumberger or Halliburton. *Id.,* ¶ 10, JA A1445. Despite having ample opportunity to conduct discovery from Ms. Rutherford, ARG, D3D, and CEP, Schlumberger was unable to point to any Power Point prepared by anyone from CEP in the record. Mr. Collins confirmed that neither he nor anyone at CEP provided any recommendation to Ms. Rutherford that ARG or D3D should or should not file suit against Schlumberger. *Id.,* ¶ 11. Mr. Collins also testified that Ms. Rutherford has never told him or anyone at his firm that she concurred in the decision to file the patent infringement suit against Schlumberger. *Id.,* ¶ 12. Mr. Collins further testified that neither he nor anyone at his firm had any communication with Ms. Rutherford regarding the patent litigation against Schlumberger. *Id.,* ¶ 13. Finally, Mr. Collins testified that, from the outset of his

firm's involvement with the '319 patent, Ms. Rutherford was walled off from any discussion of Schlumberger or its technology with anyone at CEP. *Id.,* ¶ 14.

## V.    SUMMARY OF THE ARGUMENT

The breadth of the District Court's order is both sweeping and unprecedented in its scope. The District Court disqualified Ms. Rutherford from representing D3D in this case based on the presumption that she possessed confidential information of her former employer, Schlumberger. The District Court then imputed this presumption to every attorney-employee in the Acacia organization, and double-imputed it to D3D's outside counsel, CEP – all without any evidence that Ms. Rutherford ever revealed any Schlumberger confidential information or even possessed any such information related to the litigation. Finally, after disqualifying every attorney in the Acacia organization and CEP, the Court dismissed D3D's case.

The District Court's order is based on numerous legal errors and clearly erroneous findings of fact which have no support in the evidence. Instead of engaging in the painstaking analysis to identify any specific legal and factual issues common to both Ms. Rutherford's prior work at Schlumberger and this case as required by Fifth Circuit precedent, the District Court concluded in conclusory fashion that her past work and the current case are "substantially related" because they both involve a product named Petrel. Under Fifth Circuit precedent, that

evidence is legally insufficient to support a finding that Ms. Rutherford should be disqualified under the "substantial relationship" test.

In imputing Ms. Rutherford's alleged conflict to all lawyer-employees across the Acacia organization, the Court found that D3D had failed to rebut a presumption that Ms. Rutherford disclosed to others in Acacia some unspecified Schlumberger confidential information that she is only presumed to possess. This finding is clearly erroneous, however, in light of uncontroverted, competent evidence establishing that no such disclosure took place. The District Court also committed legal error by failing to weigh the egregious harm that D3D would suffer as a result of disqualifying Mr. Fischman and every attorney-employee of Acacia against the any possible harm to Schlumberger if these lawyers were not disqualified.

In disqualifying every attorney at CEP, the District Court committed legal error by ignoring binding Fifth Circuit precedent which requires the party seeking disqualification of a disqualified lawyer's co-counsel to prove actual disclosure of the former client's confidential information to co-counsel. Instead, the District Court erroneously adopted an approach that shifted the burden to D3D after the Court presumed that Schlumberger's confidential information was disclosed to CEP by Ms. Rutherford. The District Court's finding that D3D had failed to rebut this presumption is clearly erroneous in light of uncontroverted evidence that no

confidential information of Schlumberger was disclosed to CEP, and that no one at the firm has had any communication with Ms. Rutherford about this case.

Finally, the District Court committed legal error in dismissing this case. There is no legal authority supporting dismissal of a party's case simply because its counsel has been disqualified. While the District Court justified the result based on its concern that Schlumberger would "face significant prejudice" if D3D were permitted to pursue its claims, the District Court never identified or attempted to quantify this prejudice. Moreover, the District Court never considered the egregious harm that D3D would suffer from dismissal of its case.

## VI.    STANDARD OF REVIEW

This Court must review questions of law *de novo*. The Court should also review the evidentiary record *de novo* because the District Court stated it would *not* review the whole record.  A3381-83; A3467 ln. 8-11.

Because this appeal "does not raise issues unique to [the Federal Circuit's] jurisdiction," this Court is to apply "the law of the regional circuit in which the district court sits, in this case the law of the Fifth Circuit."  *In re Data Treasury Corp.*, Case No. 2010-M928, 2010 U.S. App. LEXIS 16631, at *5 (Fed. Cir. Aug. 5, 2010) (applying Fifth Circuit law to petition for writ of mandamus concerning an order disqualifying a law firm).

As a general matter, "a district court abuses its discretion if it bases its decision on an error of law or a clearly erroneous assessment of the evidence." *United States*

*v. Mann*, 161 F.3d 840, 860 (5ᵗʰ Cir. 1998). These standards are used to review a ruling on a motion to disqualify counsel: "The proper standard of review… is an abuse of discretion standard. But in applying this standard, this Court should review fact-findings for clear error, and it should perform a 'careful examination,' or *de novo* review, of the district court's application of the relevant rules of attorney conduct." *FDIC v. United States Fire Ins. Co.*, 50 F.3d 1304, 1311 (5ᵗʰ Cir. 1995) (appeal from disqualification order).

## VII. ARGUMENT

**A. The District Court erred in holding that the subject matter of Rutherford's former representation of Schlumberger is substantially related to her alleged representation of D3D in this case.**

> *1. The District Court erred legally and factually by relying upon Schlumberger counsel's unsworn descriptions of the contents of documents allegedly showing what Ms. Rutherford worked on while at Schlumberger instead of reviewing the actual documents. Further, Schlumberger's unsworn descriptions cannot provide a factual basis for affirming the District Court's finding that the substantially related test was satisfied.*

In order to disqualify Ms. Rutherford in this case based on her former representation of Schlumberger, the District Court was required to find that Schlumberger had proven 1) an actual attorney-client relationship between itself and Ms. Rutherford, and 2) a substantial relationship between the subject matter of the former and present representations. *In re American Airlines, Inc.,* 972 F.2d 605, 614; *Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 646 F.2d 1020, 1029 (5ᵗʰ Cir. 1981) (quoting *Brennan's, Inc. v. Brennan's Restaurants, Inc.,* 590 F.2d 168,

174 (5th Cir.1979))[5]. The parties did not dispute that Ms. Rutherford formerly had an attorney-client relationship with Schlumberger. Thus, the District Court's disqualification inquiry focused on applying the "substantial relationship" test.

A substantial relationship may be found only after "the moving party delineates with specificity the subject matters, issues and causes of action" common to prior and current representations and the court engages in a "painstaking analysis of the facts and precise application of precedent." *Id.* Several lower courts have applied the substantial relationship test in the context of a three-factor analysis that examines "(1) the factual similarities between the current and former representations, (2) the similarities between the legal question posed, and (3) the nature and extent of the attorney's involvement with the former representation." *See Soverain Software LLC v. CDW Corp.*, 2010 WL 1038731, at *2 (E.D. Tex. March 18, 2010); *Power MOSFET Techs., L.L.C. v. Siemens AG,* 2002 WL 32785219, at *2, No. 2:99–CV–168 (E.D. Tex.2002) (Folsom, J .); *Dieter v. Regents of Univ. of California,* 963 F.Supp. 908, 912 (E.D. Cal. 1997) (citing *Silver Chrysler Plymouth Inc. v. Chrysler Motors Corp.,* 518 F.2d 751, 760 (2nd Cir. 1975)).

The rules of disqualification should not be applied mechanically. *OneBeacon*

---

[5] Because the motion to disqualify does not raise issues unique to this Court, the law of the regional circuit in which the District Court sits – in this case the Fifth Circuit – should apply. *In re Datatreasury Corp.,* 2010 WL 3074395, at *1 (Fed. Cir. Aug. 5, 2010).

*Ins. Co. v. T. Wade Welch & Assoc.*, 2012 WL 393309, at *3 (S.D. Tex. Feb. 6, 2012) (citing *Johnston v. Harris County Flood Control Dist.*, 869 F.2d 1565, 1569 (5th Cir. 1989)). Indeed, the District Court is required to "scrutinize the 'precise nature of the relationship between the present and former representations.'" *OneBeacon Ins. Co.*, 2012 WL 393309, at *3[6]. "Sustaining this burden requires evidence of specific similarities capable of being recited in the disqualification order." *NCNB Tex. Nat'l Bank v. Coker*, 765 S.W.2d 398, 399-400 (Tex. 1989).

Here, Schlumberger was required to "delineate with specificity the subject matters, issues and causes of action" common to Ms. Rutherford's prior and current representations. *In re American Airlines, Inc.,* 972 F.2d at 614. However, instead of submitting the documents that it claims show Ms. Rutherford's involvement with Petrel while at Schlumberger, it provided the District Court with a "privilege-type" log in which Schlumberger's outside counsel simply characterized what Schlumberger contended that the documents would show. *See* A846-859 (stating "THIS IS <u>NOT</u> A PRVILEGE LOG"). While Schlumberger stated that the documents would be made available for *in camera* inspection upon request, it is telling that Schlumberger did not submit them.[7] Moreover, the District Court *never*

---

[6] *See also Johnston*, 869 F.2d at 1569; *Duncan*, 646 F.2d at 1029

[7] Perhaps the best evidence that the documents do not show what the "privilege-type" log characterizes them to be is Schlumberger's failure to submit them to the District Court for *in camera* review.

*asked for them, much less reviewed them.* Instead, the District Court improperly relied on the unsworn, conclusory statements and vague characterizations of evidence contained in the "privilege-type" log for evidence of what Ms. Rutherford worked on while employed by Schlumberger. The District Court thus committed legal error by relying upon what amounts to attorney argument instead of reviewing the actual evidence that the attorney argument sought to characterize.

The only competent evidence in the record of what Ms. Rutherford was exposed to during her tenure at Schlumberger is her deposition testimony. As noted above and discussed below, that testimony fails to establish anything more than a superficial commonality between the "subject matters, issues and causes of action" of her prior representation and D3D's patent litigation against Schlumberger.

2. *The District Court committed error legally and factually by failing to engage in a painstaking analysis of the facts and precise application of precedent before making an unwarranted finding a "substantial relationship" between Rutherford's work at Schlumberger and this case.*

The District Court's findings with respect to the substantial relationship test are set forth in a few brief sentences in its Order. A9. The District Court concludes that Schlumberger satisfied the test because it allegedly produced documents indicating that the allegedly infringing features of Petrel existed in its older versions and that Ms. Rutherford was involved in efforts to license Petrel during her tenure at Schlumberger. The District Court, however, fails to point to any specific piece of evidence establishing what degree of exposure that Ms. Rutherford had to Petrel in

her prior representation or linking that exposure to the facts, issues, and subject matter of this case. Moreover, the District Court failed to scrutinize or even identify the precise nature of the relationship between this case and Ms. Rutherford's exposure to Petrel at Schlumberger as required by Fifth Circuit precedent. *OneBeacon Ins.*, 2012 WL 393309, at *3. In addition, the District Court failed to undertake or even acknowledge the three-factor analysis cited above that other district courts in the Fifth Circuit have employed when applying the substantial relationship test. *See Soverain Software*, 2010 WL 1038731, at *2; *Power MOSFET,* 2002 WL 32785219, at *2. In short, the Court committed clear legal error by failing to engage in a painstaking analysis of the facts and precise application of precedent required by the law. *In re American Airlines, Inc.,* 972 F.2d at 614; *Duncan,* 646 F.2d at 1029.

3. *The District Court erred by disregarding or failing to give proper weight to evidence demonstrating that the relationship between Ms. Rutherford's former representation of Schlumberger and this case was tangential at best.*

The District Court's conclusions regarding the substantial relationship test appear to rest on the fact that Ms. Rutherford had some general exposure to "Petrel" while at Schlumberger and that the product accused of patent infringement in the present suit is also certain patented features of Petrel. In reaching its conclusions, the District Court ignored evidence demonstrating that the relationship between the former representation and the current case are not "substantial" as a matter of fact or

law. Indeed, the great weight of the evidence establishes that there is no real or meaningful commonality between the subject matters, issues and causes of action that Ms. Rutherford worked on while at Schlumberger and the current patent infringement case. *In re American Airlines, Inc.,* 972 F.2d at 614; *Duncan,* 646 F.2d at 1029 (quoting *Brennan's,* 590 F.2d at 174). This is legally insufficient to support the Court's finding of a "substantial relationship."

In this case, the primary factual issues relate to the patented features of the '319 claims of the ***current*** version of Petrel[8], prior art to the '319 patent and the factors that would go into determining a reasonable royalty for the use of the '319 patent. None of these factual issues overlaps with the issues that Ms. Rutherford dealt with in her former representation of Schlumberger. The Goldstar project and the copyright case in Canada occurred in the 2006-2007 timeframe. A847-48; A852. They necessarily involved versions of Petrel that existed at that time which predate the issuance of the '319 patent by a number of years and which were, ipso facto, not accused of infringing the '319 patent. While Schlumberger offered Martyn Beardsell's vague and inconclusive declaration in support of the proposition that the features of Petrel that implicate the asserted claims of the '319 patent have not changed since the 2005 version, that assertion strains credulity when one considers

---

[8] The version of Petrel accused of infringement is Petrel 2013. Original Complaint, JA A100.

that new versions of Petrel were introduced in 2007, 2008, 2009, 2010, 2011, 2012 and 2013. A1145, ¶ 5.

Moreover, Schlumberger had already stated that it was not making a representation that any items on its "privilege-type" log related to the "patented Dynamic 3D feature" of the '319 patent. A1304-05. In fact, the only factual similarity between any of the items characterized on the "privilege-type" log and this patent case is that they both involve a product named Petrel – albeit different versions with different relevant features.

There is no evidence even suggesting that Ms. Rutherford identified any prior art to the '319 patent, or even knew that the '319 patent existed during her tenure there. Nor is there any suggestion in the record that she conducted or was exposed to any features of Petrel that were accused of infringing the '319 patent, or any analysis of whether the more recent version of Petrel might infringe the '319 patent (which did not issue until July of 2011), or whether the patent was valid, or what a reasonable royalty might be for infringement of the '319 patent.

There is no evidence that, while employed by Schlumberger, Ms. Rutherford was ever involved in a patent infringement case involving Petrel or any remotely similar technology. While the 2007 *copyright* case in Canada involved Petrel, it involved the 2003 and 2004 versions that predated the issuance of the '319 patent by at least seven years. *See* A892-93; A34. In addition that case presented none of

the legal or factual issues that are present in a patent case (*i.e.*, infringement, validity and what constitutes a reasonable royalty)[9]. There is no evidence in the record that Ms. Rutherford learned any technical details about how those very early versions of Petrel worked in connection with managing outside counsel in that case. The only factual issues in that case were whether the defendant had obtained unauthorized copies of Petrel in China, made further unauthorized copies, loaded those on its computers in Canada, and used them. *Id.*

The fact that a large, complex suit of products named "Petrel" is involved in both the copyright infringement case and this patent infringement case is not enough to establish a substantial relationship between the two cases. The case law makes clear that cases are not related, much less substantially related, by virtue of involving the same general subject matter. For example, in *In re Texas Windstorm Insurance Association*, the moving party alleged there was a substantial relationship, and thus a conflict, because the two representations arose from the same event: Hurricane Ike. *In re Texas Windstorm Insurance Association*, 417 S.W.3d 119 (Tex.App—Houston [1st Dist.] 2013, no pet.). However, while both cases were related to Hurricane Ike, the underlying issues—improper claims settlement of two different claims—were distinct and the court held that the overarching common link, Hurricane Ike, did not

---

[9]The gravamen of Schlumberger's complaint was that defendant had acquired unauthorized copies of Petrel Version 2003 and Petrel Version 2004 in China, had made further unauthorized copies, and used those copies in Canada. JA A892-93.

matter. *Id.; see also Metro. Life Ins. Co. v. Syntek Fin. Corp.*, 881 S.W.2d 319, 320–21 (Tex. 1994) (affirming denial of disqualification motion where lawyer represented man in divorce suit, learned the structure of his business assets, and then sued the former client in a suit related to the former client's business dealings).

In another case that parallels Schlumberger's allegations, an attorney represented the San Antonio appraisal district in tax lawsuits for 22 years. *In re Drake*, 195 S.W.3d 232, 236–37 (Tex. App.—San Antonio 2006, no pet.). He then quit and began suing the appraisal district on behalf of taxpayers. *Id.* The trial court found that, during his representation of the tax board, the lawyer had learned everything about the board's strategy in such suits from its manner of handling discovery to its methods for questioning witnesses to its usual settlement positions. *Id.* Despite this common overlap—which is far greater than what Schlumberger alleged in this case—the court found that such facts "fall[ ] short of the requisites of the established substantial relation standard." *Id.* at 237.

These principles hold equally true in the patent context. Here, the District Court found a substantial relationship between Ms. Rutherford's former and current representations based at least in part on her involvement in the Canadian copyright piracy suit involving the 2003 and 2004 versions of Petrel. However, numerous cases make clear that even two successive *patent-related* representations are not substantially related for disqualification purposes merely because similar technology

is involved in both representations. *See, e.g., Power MOSFET Techs.*, 2002 WL 32785219 at *3 ("Just because two devices fall into the same general category, e.g. photocopiers or Power MOSFETS, does not necessarily mean patent infringement cases in that same category will be substantially related."). In *Power MOSFET*, the court denied a motion to disqualify in part because, when "advances have propelled technology forward, earlier products can differ dramatically from later products." *Id.* Courts have also emphasized that, for complex products, the particular features accused of infringement are highly probative of the "substantial relationship" issue. *Id.*; *see also Biax Corp. v. Fujitsu Computer Sys. Corp.*, No.2:06-CV-364 (TSW), 2007 WL 1466638, at *2-3 (E.D. Tex. May 16, 2007) (denying motion to disqualify where current and prior representations both involved server technology, but "the specific aspects of server technology related to those representations are quite different"); *Ciba-Geigy Corp. v. Alza Corp.*, 795 F.Supp. 711, 717 (D.N.J. 1992) (denying motion to disqualify and finding no substantial relationship suit alleging infringement of patent for transdermal nicotine patch and suit alleging infringement of patent for transdermal estradiol patch despite overlapping depositions and document review).

The result should have been no different here. While both the Canadian copyright case and this patent case involve a complex suite of products known as "Petrel;" that is where the overlap ends. The Canadian case involved allegations that

the Defendant had illegally copied the *2003 and 2004 versions of Petrel*. A982-83. The present patent infringement case concerns allegations that certain specific features of *the 2013 version of Petrel* infringe a patent that was not even issued until four years after the conclusion of that copyright case and seven years after the last version of Petrel at issue in the copyright case had been published. Those facts alone are sufficient to disprove the existence of a substantial relationship. *See Power MOSFET*, 2002 WL 32785219 at *3.

In support of its conclusion that the substantial relationship test had been met, the District Court also cited unspecified "evidence that Rutherford was involved in efforts to license the Petrel during her representation of Schlumberger." Order, p. 8. Aside from the fact that any such "evidence" necessarily came from the unsworn attorney-written characterizations in Schlumberger's "privilege-type" log, any involvement in licensing of Petrel by Ms. Rutherford is completely irrelevant to the issues presented in this case – whether a Schlumberger products infringes the'319 patent, whether the '319 patent is valid, or an appropriate royalty for use of the patent. Indeed, general knowledge and litigation strategies of an organizational entity have long been held insufficient and expressly rejected as forming a substantial relationship with a later representation. Model Rule 1.9, cmt. 3; s*ee also* Exh. I, Hricik Declaration, pp. 7, 30.

The evidence overwhelmingly established that Ms. Rutherford's exposure to

Petrel while at Schlumberger was tangential at best, and the District Court's findings to the contrary are clearly erroneous. Ms. Rutherford testified that she did not supervise and was not directly involved in any Goldstar projects. Rutherford Depo., Vol. I, 162:18-20, A1406; 163:15-19, A1407. Her only involvement with the Petrel Goldstar project was to furnish another Schlumberger lawyer, Jenny Salazar, with generic guidelines on how to perform a Goldstar project. *Id.* at 163:1-19, A1407; 166:23-4, A1409; 167:18-21, A1410. She further testified that she does not recall receiving the Goldstar report that allegedly involves Petrel and that she only received a one-page summary from the attorney who prepared the report. *Id.* at 165:22-166:3, A1408-09. She also testified that she does not recall ever seeing the 2011 report that allegedly mentions Petrel at some point. *Id.* at 177:24-178:3, A1411-12. These documents are not her work product nor has Schlumberger shown that she had any substantial involvement in their preparation. In fact, she does not even recall seeing either of them. *Id.* at 165:22-166:3, A1408-09; 177:24-178:3, A1411-12.

4. *The District Court erred by disregarding Ms. Rutherford's limited role as a supervisory in-house counsel when applying the substantial relationship test.*

In concluding that the substantial relationship test had been met, the District Court also improperly failed to consider or give proper weight to evidence that Ms. Rutherford's role at Schlumberger was that of a supervisory in-house attorney. The American Bar Association, in a formal ethics opinion issued in 1999, clarified that the fact that a former in-house lawyer bore some supervisory responsibility for a

matter while in-house does not necessarily mean that the lawyer personally represented her former employer in that matter for purposes of applying the disqualification rules. A.B.A Formal Op. 99-415. A 1546. The ABA emphasized that in order for the activities of a former in-house lawyer to disqualify that lawyer in a subsequent representation, the lawyer's former role while in-house in critical:

> The fact that the lawyer had represented his former employer in similar types of matters or that the lawyer had gained a general knowledge of the strategies, policies, or personnel of the former employer is not sufficient by itself to establish a substantial relationship between the current matter and matters in the legal department at the organization for purposes of Rule 1.9(a). Moreover, general supervisory responsibility such as that exercised by the head of a legal department ordinarily is not by itself sufficient to establish that a lawyer represented his former employer in a particular matter even if it is the same as or substantially related to a matter at the new firm.

A1549.

Ms. Rutherford's deposition testimony establishes that her roles within Schlumberger's legal department – at least with respect to Petrel – were supervisory in nature. *See, e.g.,* A1403, 1405-1410. The descriptions in Schlumberger's unsworn "privilege-type" log, while not competent evidence, also indicate that her exposure to Petrel was supervisory in nature. With respect to the 2007 Goldstar report for Petrel, she did not prepare the report, or even have supervisory responsibility for it. *See supra* Section IV.B. She merely provided some high level, generic instructions for performing a Goldstar analysis to another in-house attorney. *Id.* Her role in the Canadian copyright case was limited to managing outside counsel with another

Schlumberger in-house attorney. Rutherford Depo., Vol. I, 124:18-24, A1403.  She never made an appearance in that case, which was prosecuted by an outside law firm in Canada. *See, generally*, A977-1143. Ms. Rutherford's general supervisory responsibility for or exposure to a matter that involved a different and much earlier version of Petrel and a completely different area of the law is insufficient to satisfy the substantial relationship test, even if the matter itself was the same or substantially related to this patent infringement suit. The District Court's clearly erred by concluding otherwise.

**B. The District Court erred in disqualifying Mr. Fischman and all in-house attorneys employed by Acacia and each of its subsidiaries from representing D3D in this case.**

*1. The District Court's finding that D3D failed to rebut any presumption that Ms. Rutherford shared confidential information of Schlumberger with Mr. Fischman and other in-house attorneys at Acacia was clearly erroneous, including in light of uncontroverted evidence that no such information was disclosed.*

Schlumberger's theory of disqualification as to all in-house attorney employees was that a second, *irrebuttable* presumption of disclosure of a former client's confidences attaches to all attorneys in a new "firm" once the attorney who formerly represented the client (Ms. Rutherford in this case) migrates to that new firm. A729. However, as the District Court correctly held, this is ***not*** the law in the Fifth Circuit.

Under current Fifth Circuit law, there is no irrebuttable second presumption

of disclosure, and to the extent that a presumption even exists at all, that presumption is *rebuttable*. *In re ProEducation Intern., Inc.*, 587 F.3d 296, 303-304 n. 7 (5th Cir. 2009); *see also National Oilwell Varco, L.P. v. Omron Oilfield & Marine, Inc.*, 2014 WL 6388402 at *9 (W.D. Tex. Nov. 14, 2014) (holding that there is no unrebuttable second presumption under Fifth Circuit law). What is clear after *ProEducation* is that when a lawyer is disqualified under the substantial relationship test based on work he did for a former client, the party represented by the lawyer's new firm must, *at a minimum*, be given a chance to rebut any presumption that the disqualified lawyer shared the former client's confidential information with lawyers at the new firm. *Id.*

Here, the District Court found that D3D had "failed to rebut the presumption that Rutherford shared the confidential information she acquired from Schlumberger with Acacia's legal team" and disqualified Mr. Fischman and all other attorney-employees of Acacia on that basis. A12. Assuming, *arguendo*, that the District Court's application of a second, but rebuttable presumption to its analysis was even justified since the substantial relationship test was never met, its finding that D3D failed to rebut the presumption that Ms. Rutherford shared confidential information of Schlumberger with Mr. Fischman and other in-house attorneys at Acacia was clearly erroneous, including in light of uncontroverted evidence that no such information was disclosed.

As support for its erroneous conclusion, the District Court points to evidence that Ms. Rutherford attended two meetings with the inventors at which the potential acquisition of '319 patent from AGM was discussed. A12. The Court also noted that she reviewed the patent in anticipation of litigation and participated in a telephone call in which a Power Point presentation was made recommending that Acacia acquire the '319 patent. *Id.* Finally, the District Court concludes that Ms. Rutherford "approved" the recommendation to acquire the '319 patent, sue several companies, including Schlumberger, and hire the Collins, Edmonds firm as outside counsel. *Id.*

A review of all of the evidence in the record, and of what is glaringly ***not found*** anywhere in the record, demonstrates that D3D conclusively rebutted any presumption that Ms. Rutherford could have shared any of Schlumberger's confidential information with anyone at Acacia. The District Court clearly erred by holding otherwise. For example, the uncontroverted evidence establishes that Ms. Rutherford did not discuss Schlumberger's Petrel product with anyone at Acacia or Plaintiff. Rutherford Depo., Vol. I, 45:13-19, JA1388; Declaration of Matthew Vella, A3373-3374, ¶¶ 3-5; Declaration of Gary Fischman, A3375-3376, ¶¶ 4-6. Mr. Vella's and Mr. Fischman's uncontroverted testimony is that Ms. Rutherford did not provide any confidential or proprietary information of Schlumberger, including any technical information about Petrel, any analysis or knowledge of Schlumberger related to the '319 patent, or Schlumberger licensing strategies, to anyone in Acacia

or its affiliated companies. A3373, ¶ 3; A3375, ¶ 4. There is no evidence in the record to the contrary.

Ms. Rutherford's involvement with evaluation and acquisition of the '319 patent, which was eventually also asserted against five of Schlumberger's competitors in separate cases, was extremely limited and unrelated to Schlumberger. She participated in the two meetings with AGM and the phone call during which the presentation was made recommending acquisition of the '319 patent. Rutherford Depo., Vol. I at 88:16-22, A1397. The only people Ms. Rutherford has spoken to regarding the '319 Patent are people who attended these three meetings and Marc Booth, the head of engineering at Acacia. *Id.* at 93:19-94:17, A1398-99. At both meetings with AGM, when the inventors mentioned Schlumberger and Petrel, she told the participants that she used to work for Schlumberger and could not talk about Schlumberger.   Rutherford Depo., Vol. I, 42:14-25, A1385; 44:5-9, A1387; and 44:25-45:9, JA 1387-88; Rutherford Depo., Vol. II, 42:14-25, A1429. There was no further conversation about Schlumberger at either meeting. Rutherford Depo., Vol. II, 42:21-25, A1428; 44:5-9, A1429; and 44:25 – 45:9, A1429-30. There is no evidence in the record even suggesting that Ms. Rutherford communicated anything of a confidential nature about Schlumberger at these two meetings. Indeed, the testimony of Ms. Rutherford, Mr. Vella and Mr. Fischman is clearly to the contrary and unrebutted.

After the two meetings with AGM, Ms. Rutherford participated in an internal Acacia telephone conference call during which Mr. Fischman made the PowerPoint presentation recommending acquisition of the '319 patent. Rutherford Dep. Vol. I, 70:25-72:9, A1389; Fischman Decl. Ex. F, ¶ 6, A1440. However, it is uncontroverted that Ms. Rutherford excused herself from the call before there was any discussion related to Schlumberger and did not rejoin. Fischman Decl. ¶ 6, A1440. Rutherford Depo., Vol. I, 72:10-19, A1389. Acacia's decision to acquire and enforce the '319 patent was made by Mr. Vella at the conclusion of the conference call and after Ms. Rutherford had departed. Fischman Decl. ¶ 8, A1440. Ms. Rutherford did not participate in that decision.  Her sole involvement was limited to concurring in the recommendation made by other participants on the call. *Id.* at 79:17-80:14, A1392-93; 86:9-87:6, A1395-96; Vella Decl., ¶ 5, A3374. There is no evidence in the record that Ms. Rutherford communicated anything about Schlumberger during the telephone conference, much less anything confidential. Indeed, the testimony of Ms. Rutherford, Mr. Vella and Mr. Fischman is to the contrary.

The complaint against Schlumberger was filed without any input or feedback from Ms. Rutherford. Rutherford Depo. Vol. II, 16:4-12; 16:13-17, A1422. Ms. Rutherford's only communication to anyone at Acacia or D3D about that complaint was to thank Mr. Fischman for sending her a courtesy copy of the document. *Id.* at

17:1-8, A1423.

The District Court could not point to evidence of a single disclosure of Schlumberger's confidential information by Ms. Rutherford to anyone at Acacia or D3D. All of the evidence is to the contrary. Under the circumstances, it was clear error for the District Court to find that D3D had not successfully rebutted any presumption (to the extent that one even arguably exists in the Fifth Circuit) that Ms. Rutherford shared Schlumberger's confidential information with other lawyers at her new employer.

> 2. *The District Court committed legal error by failing to weigh the harm that D3D would suffer as a result of disqualifying Mr. Fischman and every attorney-employee of Acacia against any possible harm to Schlumberger from allowing those lawyers to continue to represent D3D.*

The District Court also committed legal and factual error by failing to weigh or give appropriate weight to the catastropic harm that D3D would suffer if Mr. Fischman and all attorney-employees of Acacia and its subsidiaries were disqualified, and balance that against any harm to Schlumberger if they were not. Even though the law is unsettled on whether a second rebuttable presumption exists at all, there is no doubt that the Fifth Circuit has traditionally applied a balancing analysis to determine whether the other lawyers at a disqualified lawyer's new firm should also be disqualified. *See FDIC*, 50 F.3d at 1313; *Cossette v. Country Style Donuts, Inc.,* 647 F.2d 526, 530 (5th Cir.1981), *disavowed on other grounds by Gibbs v. Paluk,* 742 F.2d 181, 185 (5th Cir.1984); *Woods v. Covington Cnty. Bank,*

537 F.2d 804, 812–13 (5th Cir. 1976). This approach has also been adopted in patent cases originating in the Fifth Circuit. *See, e.g., Data Treasury Corp.,* 2010 WL 3074395 at *2 (denying mandamus where the district court had concluded that the balance of harms analysis weighed against disqualifying the defendant's patent litigation counsel); *National Oilwell,* 2014 WL 6388402 at *15 (refusing to disqualify plaintiff's patent litigation counsel after concluding that the harm to the plaintiff resulting from disqualification would greatly outweigh any benefit to the defendant).

Here, the District Court failed to conduct the legally required balancing test, and further failed to consider or appropriately weigh the harm that D3D would suffer as a result of disqualifying Mr. Fischman and every in-house lawyer at Acacia against the potential harm to Schlumberger from allowing those in-house attorneys to continue to represent D3D. The District Court's failure to address the balancing test, much less apply it to the circumstances in this case was clear legal and factual error.

A recent opinion from the same judicial district in *National Oilwell* illustrates how courts use the Fifth Circuit balancing approach in a patent infringement case[10].

---

[10] The *National Oilwell* opinion was not cited or discussed by the parties in their briefing because it did not issue until November 14, 2014, six days before the hearing on the disqualification motion. It was submitted to the District Court by Dynamic 3D and by Non-Parties Mr. Fischman and ARG under Notices of Supplemental Authority on November 19, 2014 – the day before the hearing. *See* JA A3310-3346;

That District Court, after surveying the state of Fifth Circuit law, concluded that

National Oilwell should be given a chance to rebut any presumption that the

disqualified lawyer shared the confidential information of Omron, his former client,

with other lawyers at the firm representing National Oilwell in patent litigation

against Omron.[11] *National Oilwell,* 2014 WL 6388402 at *12. That District Court

appropriately reviewed the evidence in depth, including declarations by all of the

lawyers involved that no confidential information of Omron had been disclosed, and

then turned to a weighing of equitable factors[12]. *Id.* at *14. After examining the facts

of the case along with the equitable factors, that District Court appropriately

concluded that disqualification of every lawyer in National Oilwell's law firm

"would be too severe a remedy imposed on [National Oilwell] especially when

compared to the unidentified prejudice Omron will suffer if [National Oilwell's law

firm] remains on the case. *Id.* at *17. Of particular and appropriate concern to that

District Court was the fact that Omron "simply never explains to the Court *what*

*specific piece of confidential information could lead to what specific harm.*" *Id.* at

---

A3356-3376.

[11] The Court noted that under Fifth Circuit law there is no irrebuttable presumption that a lawyer shares client confidences he possesses with other members of his or her firm. *National Oilwell,* 2014 WL 6388402 at *9.

[12] These included the stage of the litigation, the delay that disqualification would cause in getting the case to trial, the familiarity of National Oilwell's lawyers with the issues, and any specific harm that Omron could suffer from disclosure of its information. *Id.* at *14-15.

*15 (emphasis added).

The case now before this Court involves a fact pattern very similar to those in *Data Treasury* and *National Oilwell*. Those cases are directly on point and, in the absence of any authority to the contrary, should be dispositive on the issue of whether the District Court here erred by disqualifying Mr. Fischman and all other attorney-employees of Acacia given the prejudice to D3D.

Like Schlumberger here, the movants in *Data Treasury* and *National Oilwell* argued that the disqualification of their former lawyer should be imputed to her new employer who was now adverse to them in patent litigation. *Data Treasury,* 2010 WL 3074395 at *2; *National Oilwell,* 2014 WL 6388402 at *4. In *Data Treasury,* this Court found that the balancing approach used by the district court comported with Fifth Circuit precedent and denied mandamus. *Data Treasury,* 2010 WL 3074395 at *2-3. In *National Oilwell*, that District Court appropriately weighed the rebuttal evidence offered by the new law firm along with the equitable considerations to reach the same result. *National Oilwell,* 2014 WL 6388402, at *17. Including by failing to even attempt to balance the harms of disqualification to the parties in this case, the District Court committed clear legal error.

Moreover, the evidence submitted by D3D establishes that the harm to D3D from disqualification of Mr. Fischman and all other in-house attorney-employees – had the District Court considered it - clearly outweighed any harm that Schlumberger

might incur if disqualification were denied. The harm to D3D from disqualification of every lawyer in the organization of its parent would be egregious. Both the disqualification motion and the order granting the motion came well into the case. The motion was not filed until August 15, 2014 – over six months after the original complaint. *See* A0701; A0093. The disqualification order did not issue until March 31, 2015 – almost 14 months after the case was filed. *See* A0002; A0093. The parties had already briefed and argued Schlumberger's *Bilski* motion. *See* A114-198; A242-528; A529-614. The *Markman* hearing in the case was set for April 2, 2014 – only two days after the dismissal order issued - and it is safe to assume that Mr. Fischman as well as the lawyers at CEP had expended significant effort in preparing for that hearing.

Moreover, Mr. Fischman was D3D's sole point person with outside counsel in this case. Rutherford Depo., Vol. I, 102:16-25, A1402.  If disqualification is affirmed, his familiarity with the case that he developed over many months will be lost and would have to be duplicated, to the extent even possible, by either a non-lawyer from within the organization who lacks his expertise in patent litigation. If forced to bring in a new lawyer from outside of Acacia to manage a re-filing of the case against Schlumberger, D3D faces the very real prospect that such a person would also be disqualified under the District Court's sweeping imputation approach

once he or she joined Acacia.[13]

Disqualification and dismissal without prejudice would also force D3D to start completely over with the case against Schlumberger, assuming it could find a person somehow not similarly subject to disqualification to manage the case in house and hire new outside counsel who would not, himself, be found "guilty" by association. Disqualification would even bar Acacia's CEO, Mr. Vella, from any participation in the case because he has a law degree. The District Court's order, if upheld, would mean that all of the internal expertise gained and resources expended by D3D during the 14 months the case was litigated and during the pre-suit diligence period would be lost.

On the other hand, there is no evidence in the record that Schlumberger would suffer any harm at all if Mr. Fischman and other in-house lawyers were not disqualified.  It was Schlumberger's burden to show why such a severe remedy is called for under the circumstances. *National Oilwell*, 2014 WL 6388402 at *15. However, like the movant in *National Oilwell*, Schlumberger never pointed to a single specific piece of confidential information possessed by Ms. Rutherford that

---

[13] Under the District Court's erroneous reasoning, any attorney hired by Acacia to work in-house would have the imputed conflict of other attorney employees of Acacia and its subsidiaries imputed to him or her so long as any attorney-employee that worked with Ms. Rutherford during her tenure at Acacia remains at Acacia. Such a result would effectively prevent Dynamic 3D from every enforcing its rights in the '319 patent against Schlumberger.

could harm it in this litigation[14] and the District Court's disqualification order was **entirely silent** and clearly erroneous on this point. Any arguably implicit finding by the Court that the balance of harms tilted in favor of Schlumberger is not supported by any evidence and is clearly erroneous.

## C. The District Court Erred in disqualifying all attorneys employed by D3D's outside litigation counsel from representing Appellant in this case.

### 1. *The District Court committed legal error by ignoring Fifth Circuit precedent and improperly imputing the alleged conflict of Rutherford to CEP.*

The District Court also committed legal error by ignoring Fifth Circuit precedent and improperly imputing the alleged conflict of Ms. Rutherford to Collins, Edmonds. The District Court, relying on *ProEducation* and *Corrugated Container*, saw its task as determining whether D3D could "rebut any presumption that Rutherford shared confidential information that she acquired at Schlumberger" with Collins, Edmonds. Order, p. 12. However, the District Court's reliance on *ProEducation* and *Corrugated Container* is misplaced and its analysis as to CEP is fatally flawed as a matter of law.

The issue of whether a conflict of a migrating in-house lawyer is imputed to outside counsel hired by the lawyer's new employer is not addressed in

---

[14] In conducting his analysis of whether there was a substantial relationship between the work that Ms. Rutherford did at Schlumberger and the '319 patent litigation, Professor David Hricik looked for specific evidence of what Ms. Rutherford had been exposed to at Schlumberger and found "no sworn testimony in the record about what she actually did." JA A1496.

*ProEducation* or *Corrugated Container*. *See ProEducation*, 587 F.3d at 297-298 (whether a conflict of an associate attorney that was based on work that his former firm had done would be imputed to the other lawyers at the associate's new firm); *In re Corrugated Container*, 659 F.2d 1341, 1341 (5th Cir. 1981) (whether a conflict of departing partners would be imputed to partners who remained behind at a firm). An entirely different line of authority in the Fifth Circuit controls on the issue of whether a conflicted lawyer's co-counsel (*i.e.*, other lawyers involved in the client representation who are not part of the lawyer's firm) are also disqualified.

It is black letter law in the Fifth Circuit that when co-counsel have not had an attorney-client relationship with the disqualified lawyer's former client, disqualification is warranted only when ***actual disclosure of the former client's confidential information*** to co-counsel is shown, *Brennan's,* 590 F.2d at 174 (emphasis added. A presumption of disclosure of confidences is inappropriate. *Id.*, *quoting Wilson P. Abraham Construction Corp. v. Armco Steel Corp.,* 559 F.2d 250, 253 (5th Cir.1977); *Ledwig v. Cuprum S.A.*, 2004 WL 573650, at *3 (W.D. Tex. Jan. 28, 2004); *Vinewood Capital, LLC v. Sheppard Mullin Richter & Hampton, LLP*, 735 F.Supp.2d 503, 524 (N.D. Tex. 2010). The Fifth Circuit has never overruled or even criticized this precedent. Even Mr. Burton, Schlumberger's expert, had to admit that he knows of no Fifth Circuit opinion that has ever used the approach to co-counsel disqualification that he and Schlumberger advocated. Burton Depo., 173:6-

20, A1371. There is no presumption, rebuttable or otherwise, in the Fifth Circuit that a disqualified lawyer shares the confidential information of a former client with lawyers outside of her law firm that are working on a matter for a client with her. *Brennan's,* 590 F.2d a 174. However, that is exactly the approach that the District Court here erroneously adopted. Instead of requiring actual proof that specific client confidences of Schlumberger were disclosed by Ms. Rutherford to Collins, Edmonds, the District Court simply noted some attenuated contacts between Collins, Edmonds and Ms. Rutherford, and ***presumed*** that confidential information must have been communicated. A13-14.

As additional authority for its approach, the District Court relied on a Texas Supreme Court case, *In re American Home Products Corp.,* and several federal district court cases which cite it. However, *American Home Products* is not controlling authority. A motion to disqualify is a substantive motion under federal law, and the District Court, while it may have considered Texas case law as guidance, must look to Fifth Circuit precedent as controlling authority. *National Oilwell,* 2014 WL 6388402, at *7 n.4.

*American Home Products* provides for a burden shifting approach once the movant has demonstrated that there were substantive conversations between disqualified counsel and co-counsel, joint preparation for trial by those counsel, or the apparent receipt by co-counsel of confidential information. *In re American Home*

*Products Corp.,* 985 S.W.2d 68, 81 (Tex. 1998). However, as even Mr. Burton had to concede, the Fifth Circuit has never adopted or even referred to the *American Home Products* approach in any opinion on disqualification of co-counsel, Burton Depo., 173:6-20, A1371.

Moreover the federal district court opinions that cite *American Home Products* do not presume a disclosure of the former client's confidences to co-counsel. They clearly follow (and cite) *Brennan's* and state that a presumption of confidences is inappropriate. *See, e.g., Ledwig v. Cuprum, S.A.,* 2004 WL 573650, at *3 (W.D. Tex. January 28, 2004) (when co-counsel have not had an attorney-client relationship with the disqualified lawyer's former client, "a presumption of disclosure of confidences is inappropriate."); *Vinewood Capital, LLC v. Sheppard Mullin Richter & Hampton, LLP*, 735 F.Supp.2d 503, 524 (N.D. Tex. 2010) ("Unless disqualified counsel has disclosed privileged information to co-counsel, disqualification of co-counsel is not proper, and a presumption of disclosure is inappropriate."). Even if the District Court were correct in following these district court opinions instead of the clear mandate of the Fifth Circuit, it was still required to find that Ms. Rutherford disclosed Schlumberger' confidential information to CEP before disqualifying CEP. Instead, the District Court's analysis erroneously began with the application of a presumption that Rutherford shared confidential information that she acquired at Schlumberger" with CEP.

In the absence of any evidence of any confidential information of Schlumberger that was communicated to Collins, Edmonds (or Mr. Fischman for that matter), the District Court's disqualification ruling devolves to nothing more than presuming that Ms. Rutherford possessed at least some confidential information gained during her employment with Schlumberger, that Mr. Fischman and all other attorney-employees of Acacia are presumed to have that information, and that Collins, Edmonds is presumed to have that information because it has had contact with Mr. Fischman about this case. However, this double imputation to Collins, Edmonds of Ms. Rutherford's alleged conflict flies directly in the face of Fifth Circuit law. *See Brennan's*, 590 F.2d at 174 (requiring movant to show actual disclosure of the former client's confidential information to disqualify co-counsel); *American Can Co. v. Citrus Feed Co.*, 436 F.2d 1125, 1129 (5th Cir. 1970) (expressly rejecting a double imputation approach to co-counsel disqualification and refusing to re-impute the imputed knowledge of disqualified local counsel to national co-counsel representing the same party). As the Fifth Circuit has correctly observed, re-imputation to co-counsel could require disqualification "*ad infinitum.*" *American Can,* 436 F.2d at 1129. The District Court's disqualification analysis as to Collins, Edmonds is legal error under Fifth Circuit law.

2. *There is no evidence in the record that Ms. Rutherford communicated any alleged confidential information of Schlumberger to Collins, Edmonds and the District Court's findings to the contrary are clearly erroneous.*

The District Court also clearly erred in finding that Ms. Rutherford communicated confidential information of Schlumberger to CEP. As evidence that Ms. Rutherford communicated Schlumberger's information to CEP, the District Court cites "multiple communications and conversations" that "occurred between Rutherford, Fischman, and other inhouse Acacia attorneys and Michael Collins ..." A13. However, there is *no evidence* in the record identifying any specific piece of confidential information relevant to this case possessed by Ms. Rutherford, much less that she (or anyone else) communicated it to anyone at CEP. Indeed, all of the evidence in the record – her testimony as well as that of Mr. Fischman and Mr. Collins – conclusively establishes no such information was communicated to CEP.

The District Court cites contacts that Ms. Rutherford claimed to have had with Michael Collins during the phone call in which he allegedly made a PowerPoint presentation recommending that Acacia acquire the '319 patent. However, as discussed both above and below, Mrs. Rutherford's testimony is simply incorrect in this regard. Mr. Collins and Mr. Fischman both provided clear and unequivocal declarations that no outside counsel was present for the phone call in which Mr. Vella decided to acquire the '319 Patent. In addition, no such PowerPoint is found in the record, even though Schlumberger conducted extensive discovery from Acacia, Ms. Rutherford, Mr. Fischman, AGM, D3D, and CEP. Even if Ms. Rutherford's testimony were correct, the District Court did not point to a single piece

of Schlumberger confidential information that Ms. Rutherford disclosed or even could have disclosed to Mr. Collins during that phone conversation. Indeed, the uncontroverted evidence is that Collins was not even aware of the '319 Patent at the time of that call, and that Ms. Rutherford left the call before Schlumberger was discussed and did not rejoin. Fischman Decl., ¶ 6, A1440; Rutherford Depo., Vol. I, 72:10-19, A1389.

The District Court also cites Ms. Rutherford's and Mr. Fischman's decision to hire Collins, Edmonds as outside counsel as evidence of a communication of Schlumberger confidential information to Collins, Edmonds. The District Court failed to explain how a hiring decision made by solely by Ms. Rutherford and Mr. Fischman was somehow a communication of Schlumberger's confidential communication to Collins, Edmonds, or identify any information that was communicated by or in connection with the decision.

The District Court notes Mr. Fischman's direct communication with Collins, Edmonds during the prosecution of this case. A14. However, the District Court failed to point to any piece of confidential information of Schlumberger that Fischman allegedly had or disclosed to Collins, Edmonds. As noted above, the Court has never even been able to identify any confidential information of Schlumberger that Fischman has allegedly learned from Ms. Rutherford. Instead, the District Court's disqualification theory rests on the flawed legal theory that Collins,

Edmonds is presumed to have acquired Schlumberger's confidential information from Mr. Fischman, who is presumed to have acquired it from Ms. Rutherford, who is presumed to possess it because the District Court erroneously found that work she formerly did for Schlumberger is substantially related to the present case. As discussed above, this approach is erroneous as a matter of Fifth Circuit law. *See American Can Co.* at 1129 (refusing to re-impute the imputed knowledge of disqualified local counsel to national co-counsel representing the same party).

The District Court also points to Ms. Rutherford's testimony that she continued to work with CEP on separately filed cases involving different defendants accused of infringing the '319 patent. A14. The Court expresses concern that the same issue of patent validity is involved in these cases. The Court, however, never identifies what confidential information of Schlumberger could be implicated in connection with the validity analysis, especially in view of the fact that there is no evidence that Ms. Rutherford had any exposure to the '319 patent while she was employed by Schlumberger, or that Schlumberger was even aware of that patent's existence during her tenure there. Once again, the District Court identified no specific confidential information of Schlumberger that Ms. Rutherford could have communicated to CEP in connection with the lawsuits against Schlumberger's competitors.

The District Court also cites evidence that Mr. Fischman forwarded

information about the present case to Ms. Rutherford as evidence that Ms. Rutherford communicated Schlumberger's confidences to CEP through Mr. Fischman. A14. However, the only evidence in the record is that Mr. Fischman forwarded a courtesy copy of the complaint against Schlumberger to Ms. Rutherford. Moreover, it strains credulity to conclude that a complaint forwarded by Mr. Fischman and a simple "thank you" from Ms. Rutherford in response is somehow indicative or even probative of a communication of Schlumberger's information by Ms. Rutherford to Mr. Fischman, much less a communication to Collins, Edmonds, who were not involved in the exchange or even shown by Schlumberger to be aware of it.

Finally, the District Court appears to rely at least in part on Ms. Rutherford's testimony that she concurred in the decision to sue Schlumberger. However, Mr. Collins's declaration was clear that Ms. Rutherford never communicated this alleged concurrence to either him or anyone else in his firm. Collins Decl., ¶ 12, A1445. And, even if she had, the District Court identifies no specific confidential information of Schlumberger that was or could have been communicated with a simple concurrence made after the fact with a decision made by others at Acacia. The District Court's finding that Ms. Rutherford communicated confidential information of Schlumberger to Collins, Edmonds is not supported by any probative evidence and is clearly erroneous.

3. *The District Court's finding that D3D failed to rebut an alleged presumption that confidential information of Schlumberger was disclosed to Collins, Edmonds was clearly erroneous, including in light of uncontroverted rebuttal evidence establishing that no confidential information of Schlumberger was disclosed to Collins, Edmonds.*

Assuming, *arguendo*, that the Fifth Circuit might overrule *Brennan's* and adopt the *American Home Products* approach to co-counsel disqualification[15], the District Court's approach would still constitute clear error and an abuse of discretion because the Court ignored D3D's uncontroverted rebuttal evidence establishing that no confidential information of Schlumberger was disclosed to Collins, Edmonds. If it was following lower court methodology set forth in *Ledwig* and *Vinewood*, the District Court was required to first find that there were substantive conversations between the disqualified lawyer (Ms. Rutherford) and co-counsel (Collins, Edmonds), joint preparation for trial by those counsel, or the apparent receipt of the former client's confidential information. *Ledwig*, 2004 WL 573650, at *3; *Vinewood*, 735 F.Supp.2d at 524.  Even if the Court believed that Schlumberger had met this burden, the District Court was still required to afford D3D the opportunity to present rebuttal evidence that confidential information was not disclosed to Collins, Edmonds by Ms. Rutherford. *Id*.

There is no legally sufficient evidence of any substantive conversations

---

[15] As noted above, The Fifth Circuit has given no indication that it would abandon or modify its holding in *Brennan's*.

between Ms. Rutherford and CEP about this case, joint preparation for trial of this case by those counsel, or the apparent receipt of the Schlumberger's confidential information by Collins, Edmonds. The District Court clearly erred to the extent that it found otherwise. Even if Ms. Rutherford's incorrect testimony regarding Mr. Collins' alleged presence at the conference in which the recommendation to acquire the '319 patent was made were correct (which it is not),[16] that testimony does not support a presumption that she disclosed Schlumberger's confidential information. The uncontroverted evidence is that she removed herself from the call before there

---

[16] While Ms. Rutherford testified that Mr. Collins participated in the conference in which the recommendation to acquire the '319 patent was made, the timeline established by the declarations of Mr. Collins and Mr. Fischman demonstrates that neither Mr. Collins nor anyone at Collins, Edmonds could have been involved in the telephone presentation that led to the decision to acquire and enforce the '319 patent. Acacia entered into an agreement with AGM to acquire the '319 patent on August 20, 2013. Fischman Decl., ¶ 4, A1439. It was Mr. Fischman and not Mr. Collins who assembled the PowerPoint presentation recommending that ARG acquire and enforce the '319 patent and presented it to Matt Vella during a November 7, 2013, telephone conference. *Id.*, ¶ 5, A1440. No outside counsel participated in the call with and PowerPoint presentation to Mr. Vella. *Id.*, ¶ 7. Mr. Collins' testimony confirms that neither he nor anyone at Collins, Edmonds prepared and/or presented a PowerPoint presentation to anyone at Acacia, including Ms. Rutherford, that made any recommendation regarding whether to acquire the '319 patent or sue Halliburton or Schlumberger. Collins Decl., ¶ 9, A1444. Indeed, there is no such Power Point in the record even though Schlumberger conducted discovery from Acacia, Dynamic 3D, Ms. Rutherford, Mr. Fischman and Collins, Edmonds. Mr. Fischman did not approach Mr. Collins of Collins, Edmonds about representing an Acacia subsidiary in the enforcement of the '319 patent until *after* making the PowerPoint presentation to Mr. Vella and *after* the decision was made to acquire and enforce that patent. Fischman Decl., A1440, ¶ 9. Thus, Collins, Edmonds could not have participated in either the phone call where the PowerPoint was presented, or in any recommendation to acquire the '319 patent.

was any discussion of Schlumberger and did not rejoin. Fischman Decl. ¶ 6, A1440; Rutherford Depo., Vol. I, 72:10-19, A1389. Mr. Vella made the decision to finalize the acquisition of the '319 patent at the conclusion of the conference call and after Ms. Rutherford departed. Fischman Decl. ¶ 8, A1440. Her testimony that she concurred with a decision to sue Schlumberger[17] is not a substantive communication, much less a communication of any confidential information of Schlumberger to Collins, Edmonds. The District Court clearly erred to the extent that it found otherwise. Her "thank you" to Mr. Fischman for forwarding a copy of the Schlumberger complaint is not a substantive communication, much less a communication of confidential information of Schlumberger. Moreover, there is no evidence that the "thank you" was ever communicated to Collins, Edmonds. In short, there is no evidence in the record of the kind of substantive conversation that would support a presumption that Ms. Rutherford or anyone else at Acacia shared any confidential information of Schlumberger with Collins, Edmonds. The Court clearly erred by finding otherwise.

Even if the District Court were correct in concluding that Ms. Rutherford had substantive contact with Collins, Edmonds about the patent infringement case against Schlumberger, D3D's rebuttal evidence conclusively establishes that no

---

[17] Mr. Collins testified that Ms. Rutherford never told him or anyone at his firm that she concurred in the decision to file the patent infringement suit against Schlumberger. Collins Decl., ¶ 12, A1445.

confidential information of Schlumberger was disclosed to Collins, Edmonds. Mr. Collins' uncontroverted testimony is that neither he nor anyone at his firm had any communication with Ms. Rutherford regarding this case. Collins Decl., ¶ 13, A1445. His uncontroverted testimony is that she has been walled off from any discussion of Schlumberger or its technology with anyone at Collins, Edmonds. *Id.* at ¶ 14. There is nothing in the record to the contrary. Even if the District Court had not erred by ignoring Fifth Circuit precedent, it clearly erred in finding that D3D had failed to rebut any presumption that Ms. Rutherford shared any confidential information of Schlumberger with Collins, Edmonds.

## D. The District Court erred in dismissing all of D3D's claims and causes of action against Schlumberger, including in view of the lack of legal authority or other legal or factual justification for such draconian relief..

The District Court cites no legal authority for its decision to dismiss D3D's claims against Schlumberger. Indeed, there is no case law or rule that requires or even supports dismissal because a party's counsel has been disqualified, and the District Court cites none. To reach such a harsh and sweeping result in the absence of legal authority is unprecedented, clear legal and factual error and an abuse of discretion. This result is particularly prejudicial because it is a party seeking to enforce a property right rather than an attorney employed to represent someone else's interests.

The single Fifth Circuit case cited by Schlumberger, *Doe v. A Corp.*, 709

F.2d 1043 (5th Cir. 1983), helps demonstrate, if anything, why dismissal is unjustified. Schlumberger misleadingly cited that case for the proposition that dismissal is warranted where "an attorney conflict of interest could jeopardize the integrity of a judicial proceeding." (A0736.) The Fifth Circuit actually upheld the plaintiff's "availability of a legal forum for the adjudication of his rights" by *reversing* the part of the district court's order dismissing the plaintiff's individual action. *A Corp.*, 709 F.2d at 1048. The district court's order was affirmed only to the extent it disqualified the plaintiff from acting *as a class representative* on the basis that "a representative owes duties to the class that require him to exert the utmost diligence on behalf of all of its members." *Id.* at 1047. D3D only sued to enforce its own rights assigned from ARG, not those of a class of plaintiffs. To the extent *A Corp.* applies, it vindicates a litigant's ability to enforce its own rights. Here, the district court deprived Acacia and its subsidiaries of that right by dismissing the case and entering judgment.

In attempting to justify dismissal, the District Court expresses concern that Schlumberger would "face significant prejudice if D3D is permitted to continue to pursue its claims against Schlumberger in this case." A17. However, other than pointing to pleadings that were allegedly drafted by lawyers that the Court *presumes* possess Schlumberger's confidential information, the Court provides no explanation of what that prejudice might be. Moreover, the Court does not identify

any evidence in the record demonstrating prejudice.

The District Court's dismissal seems to be based upon, if anything, Schlumberger's argument that dismissal is justified because the case has been somehow "tainted" from the beginning by Ms. Rutherford's alleged breaches of confidence that, in turn, should be imputed to all attorneys she has or will ever come in contact with, and so on down the line. However, neither Schlumberger nor the District Court point to a single case where a court has dismissed a case because it was "tainted" by a party's counsel, including when alleged confidential information is merely presumed to have been communicated, including contrary to the facts.

Even if this "taint" theory were correct, it would not warrant dismissal because there is no evidence in the record specifically identifying any confidential information that Ms. Rutherford disclosed in breach of Schlumberger's confidences *See* discussion *supra* Section IV.C.b. Without this proof, the alleged "taint" that Schlumberger cited as the basis for dismissal of this case is simply non-existent.

Dismissal is also unduly harsh and an abuse of discretion (to the extent that the District Court even might have had the discretion to dismiss the case, which D3D disputes), in view of the less extreme options available to the District Court. In cases where courts grant a motion to disqualify, they typically permit plaintiffs an appropriate amount of time to retain new counsel to continue pursuing the case. *See,*

*e.g., Kreeger v. State Farm Fire & Cas. Co.*, 2008 WL 1745197, at*1 (S.D. Miss. Apr. 11, 2008); *McIntosh v. State Farm Fire & Cas. Co.*, 2008 WL 941640, at *2 (S.D. Miss. Apr. 4, 2008); *Arnold v. Cargill Inc.*, 2004 WL 2203410, at *14 (D. Minn. Sept. 24, 2004). Disqualification is already an "extreme remedy," *Duncan*, 646 F.2d at 1026 n.6., and compounding that result by dismissing the case—even without prejudice—served no purpose but delay. The District Court erred legally and factually by failing to consider the extreme prejudice that dismissal would cause D3D and in failing to allow D3D a reasonable amount of time to secure new counsel before ordering dismissal.

## VIII. CONCLUSION AND PRAYER

For the reasons set forth above and those stated in D3D's Response to Defendants' Motion to Disqualify and Dismiss in the District Court (A1284-A1552), the District Court clearly erred and abused its discretion in the many respects outlined above, including in finding substantial similarity, applying inappropriate presumptions and erring in failing to find them overcome, disqualifying Charlotte Rutherford, disqualifying all in-house attorneys employed by Acacia and its subsidiaries including D3D, disqualifying D3D's outside counsel, and dismissing this case without prejudice. For the reasons stated herein, the District Court's rulings and judgment in the case below constitute clear error and an abuse of discretion and they should be reversed and remanded, including with instructions that none of the

foregoing lawyers are disqualified and that the dismissal of the case was improper.

Dated: August 20, 2015                    Respectfully submitted,

/s/ *Michael J. Collins*
Michael J. Collins
COLLINS, EDMONDS, POGORZELSKI,
SCHLATHER & TOWER, PLLC
1616 South Voss Road, Suite 125
Houston, Texas 77057
Telephone:  (281) 501-3425
Fax:  (832) 415-2535
mcollins@cepiplaw.com

ATTORNEYS FOR PLAINTIFF-
APPELLANT DYNAMIC 3D
GEOSOLUTIONS LLC

## VII.  CERTIFICATE OF SERVICE

I, Michael J. Collins, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

On August 20, 2015, a copy of the foregoing Opening Brief of Plaintiff-Appellant was filed electronically with the Clerk of the Court using the CM/ECF System, which will serve via electronic mail notice of such filing to all counsel registered as CM/ECF users.

Upon acceptance by the Court of the electronically filed document, six paper copies will be filed with the Court via courier within the time provided by the Court's rules.

Dated: August 20, 2015

/s/ *Michael J. Collins*
Michael J. Collins

COLLINS, EDMONDS, POGORZELSKI,
SCHLATHER & TOWER, PLLC

## VIII.    CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPE-FACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 28.1(e)(2)(A), because it contains <u>13,876</u> words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word, in 14 Point Times New Roman.

Dated: August 20, 2015

/s/ *Michael J. Collins*
Michael J. Collins

COLLINS, EDMONDS, POGORZELSKI, SCHLATHER & TOWER, PLLC

## ADDENDUM

1. FINAL JUDGMENT ............................................................................ A0001

2. ORDER GRANTING MOTION TO DISQUALIFY ........................... A0002